251 F.2d 345
 The MOJONNIER DAWSON COMPANY, an Illinois corporation, Plaintiff-Appellant,
v.
U. S. DAIRIES SALES CORPORATION et al., Defendants-Appellees (two cases).
The MOJONNIER DAWSON COMPANY, an Illinois corporation, Plaintiff-Appellee,
v.
U. S. FILLER EQUIPMENT, Inc., et al., Defendants-Appellants.
 Nos. 11784-11786.
 United States Court of Appeals Seventh Circuit.
 January 15, 1958.
 As Corrected February 5, 1958.
 Rehearing Denied February 13, 1958.
 
 John F. McCanna, Oak Park, Ill., for Mojonnier Dawson Co.
 Richard E. Voland, Howard W. Clement, Chicago, Ill., for U. S. Dairies Sales.
 Sheldon W. Witcoff, Louis Bernat, Chicago, Ill., for U. S. Miller Equipment.
 Before FINNEGAN, SCHNACKENBERG and HASTINGS, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 In count I of its second amended complaint, filed September 27, 1954, plaintiff alleged infringement by defendants[1] of claims 1, 6 and 7 of Mojonnier United States reissue patent No. 23,830, and, in count III, alleged unfair competition and aggravation of the infringement by defendants.
 
 
 2
 The Brasile defendants filed an answer, denying infringement, and a counterclaim charging plaintiff with unfair competition, to which plaintiff filed an answer. The Lewis defendants also answered.
 
 
 3
 The case was tried on these pleadings. At the close of plaintiff's case, the court dismissed the action as to the Lewis defendants.
 
 
 4
 At the close of all the evidence, the court held that the patent was invalid in its entirety and that there was no unfair competition by either plaintiff or the Brasile defendants. The charge of infringement and various defenses advanced were not decided.
 
 
 5
 The patent in suit, issued to Albert B. Mojonnier, and assigned to plaintiff, recites that it relates to mechanisms for dispensing milk, whipping cream, beverages, syrup, paint, shellac, hand lotion, cosmetics, insecticides, powders, drugs, and other free-flowing fluids and comminuted materials, and more particularly to mechanisms for dispensing such free-flowing materials into containers.
 
 
 6
 Plaintiff's brief asserts that the Mojonnier machine is especially designed for repetitive production filling in commercial plants where the filling operations require a high degree of accuracy in the quantity dispensed at each filling and where the cost of such filling operations is important and further, that this machine is of particular utility in the dairy industry for filling milk into wax or paraffin-treated paper cartons commonly known as "paper cartons"; also in the aerosol industry for filling chemicals, propellants and products into the so-called aerosol "bombs" for spraying or dispensing insecticides, deodorants, shaving soap, whipping cream and many other products.
 
 
 7
 The Mojonnier patent refers to a vacuum plunger type dispensing mechanism said to have been theretofore widely used, stating that this type had not always been satisfactory for dispensing free-flowing fluids, particularly with reference to accuracy, i. e. being able to dispense within very close tolerances the same volume of weight of fluid upon successive operations of the dispensing mechanism. It also asserts that vacuum dispensing mechanisms, while fairly accurate for dispensing fluid into a container to a preselected level, are not accurate insofar as volumetric displacements of free-flowing fluids are concerned, and that the plunger type is not so accurate when utilized for free-flowing fluids; that different mechanisms must be used for each of different products and they cannot be quickly adapted to other products; that the mechanisms have so many small parts they are difficult to assemble, clean and service; that the attempted use of some such mechanisms in the dairy and like industries has met with disfavor, and in some cases health officials have disapproved their use due to the fact that milk passing through such units is subject to contamination because they cannot be adequately cleaned; that the paint industry does not employ dispensing mechanisms to any great extent because it is so hard to clean the complicated mechanisms and difficult to change from one color to another, with the result that it is more economical and practical to fill the cans by manual operation.
 
 
 8
 In the face of these conditions, Mojonnier, by his patent, seeks to accomplish the following objects:
 
 
 9
 (1) a multi-purpose dispensing mechanism that may be used to accurately dispense volumetrically any free-flowing liquid; (2) novel means for dispensing to a high degree of accuracy predetermined volumes of fluid upon successive actuations; (3) a simple construction relatively inexpensive to manufacture, easy to assemble and disassemble, and requiring a minimum of maintenance; (4) easy changing to any desired volume within the limits of the dispensing mechanism; (5) control of the splash effected by discharging the fluid into a receptacle; (6) a novel dispensing mechanism that may be used on a variety of fluids; (7) a novel mechanism that can be thoroughly and readily cleaned and maintained in a sanitary condition; and (8) a mechanism wherein there is a minimum amount of fluid left in the dispenser at the end of a dispensing run.
 
 Claim 1 follows:
 
 10
 "1. In a dispensing mechanism, the combination of a fluid container, means for supplying fluid to said container, means in said container operable to maintain the fluid in the container at a preselected level, a valve mounted on the container for dispensing fluid from the container into a receptacle, a solenoid mounted on said container for operating said valve, a member extending through said container for interconnecting said solenoid and said valve, an interval timer for controlling the energization of the solenoid and means to actuate said timer to energize said solenoid and thereby move said member to open said valve, whereby a substantially constant volume of liquid is dispensed each time said solenoid is energized."
 
 
 11
 Claims 6 and 7 were added by the application for the reissue patent.[2]
 
 Claim 7 follows:
 
 12
 "7. A filling machine for delivering an accurately controlled predetermined quantity of milk and other free flowing fluids for the repetitive filling of individual milk containers and the like each in a single complete operation, the combination of a large source of fluid, a fluid supply container having a fluid capacity substantially smaller than said source and larger than the quantity to be delivered in filling said individual containers, a fluid delivery line interconnecting said source and said supply container, a valve operable to control the flow of fluid through said fluid delivery line into said supply container, the supply container being provided with a bottom delivery outlet having a given orifice factor and area of orifice through which outlet orifice the fluid freely flows by gravity, a valve in said outlet operable between an open position in which the fluid flows for delivery into an individual container located beneath said supply container and a closed position for stopping said flow, a float in said supply container operable to control the first mentioned valve to replace the fluid in said supply container as it is dispensed and also operable to maintain the fluid in the supply container at a preselected level and providing a hydrostatic head of predetermined value with relation to said orifice factor and area of orifice whereby to effect controlled relatively rapid continuous flow of the fluid from the supply container to said individual container when the second mentioned valve is held open, a solenoid for operating said second mentioned valve, operating means interconnecting said second mentioned valve and said solenoid, and an interval timer for controlling the energization of said solenoid to continuously hold open said second mentioned valve for a preselected time period to control a continuous uninterrupted flow delivery of the fluid to said individual container whereby the preselected constant factors of said hydrostatic head in the supply container and said orifice delivery produce relatively rapid filling of said individual container and control of splash effect of the fluid in its discharge into said individual container, said timer being adjustable to vary said time period and the predetermined quantity of fluid delivered to each individual container."
 
 
 13
 We now state the controlling facts on the question of validity, established by (1) the admitted allegations in the pleadings, (2) documents and physical exhibits admitted in evidence and (3) uncontradicted testimony.
 
 
 14
 For many years milk had been delivered to the consumer in glass bottles, in quart, pint and half pint sizes. These bottles were filled by machines wherein the bottle itself served as the measure or the bottle was filled from a measuring pot in the machine. The glass bottle, because of its fixed and rigid body, may be forcibly used to unseat the valve mechanism in a filler, also the bottle itself may be used as a measure as the flowing milk fills it. Machines of the Beyer type were economically available to small dairymen, and the larger dairies used multiple unit machines of the McKinnis and Winton type for their higher production requirements.
 
 
 15
 Some 20 years before the Mojonnier invention, paper cartons began to supplant the glass bottle. In these cartons, paper structure is flexible and subject to distortions by contact forces and pressures. Because of these variables the paper carton cannot be used as the measure of the quantity dispensed.
 
 
 16
 In production filling, the need for accuracy in the quantity of milk dispensed is essential, first because over-measures in repeated fillings would mean a serious loss to the producer and unsanitary operating conditions and, secondly, short measures would violate the usual local and federal regulations for protection of the consumer. This is in contrast to beverage dispensers, where considerable variation may occur in dispensing (for instance) a cup of coffee or a carbonated beverage.
 
 
 17
 Local and federal health authorities check all equipment of this kind. In the case of milk the equipment must be thoroughly washed and cleaned daily. Where a filling mechanism has many intricate parts this task becomes burdensome and costly.
 
 
 18
 Accuracy in flow control by the Mojonnier device enables almost instant changes from one-sized delivery to another, i. e., pints to quarts, etc., in cases of widely varying viscosity or volumetric quantity of liquids to be dispensed. The Mojonnier machine attains this result by changing nozzles to obtain the desired relationship between the orifice factor and the hydrostatic head valve. Milk flowing at high velocity or pressure into a container ordinarily results in objectionable splashing and foaming. The Mojonnier combination controls splash and foam within tolerable limits. Some prior art types which have variable pressure conditions are unsatisfactory for milk production filling, although they may serve the requirements of beverage dispensing.
 
 
 19
 Prior to the Mojonnier invention there were mainly two types of machines for filling milk into paper cartons, one operating on the piston filling principle used for "Pure-Pak" cartons, the other operating on the displacement principle similar to a measuring cup and used for "American Can" cartons. "Pure Pak" carton filling machines made by Ex-Cell-O Company were leased, or sold at prices around $10,000 to $12,000 and up to $60,000 to $70,000. "American Can" carton filling machines were leased, or sold at upwards of $10,000 in the prewar period and their large machine around $75,000. At the time of the trial the smaller "American Can" machine was selling for about $22,000 and the larger one for about $34,000.
 
 
 20
 The small dairy plant was accustomed to paying only from $1,000 to $5,000 for glass bottle filling machines.
 
 
 21
 Mojonnier's first trial test filler was sold to Bowman Dairy Co. for $385 and commercial fillers for about $1,000 to $1,200.
 
 
 22
 A common type of dispenser, known as an aerosol bomb, is used for spraying insecticides. A certain amount of insecticide is placed in a tin can and then what is known as a "propellant" is put in. One of the most commonly used propellants is "Freon", a chemical material which at room temperature and atmospheric pressure is a gas. Under atmospheric pressure and low temperature it becomes a liquid. Liquid Freon is put in the can under the "cold fill" method. The can is sealed with a cap which includes a spring pressed valve with a small tube extending to the bottom of the can. As soon as this can with the Freon and the insecticide has been sealed and brought to room temperature, the Freon tends to gasify. Since it is confined in the can it develops a considerable pressure of about 30 to 40 pounds per square inch. By merely opening the valve with a finger action the high pressure within the can forces the insecticide out in a spray. This general principle is used for dispensing whipping cream, shaving soap and many other products.
 
 
 23
 Another way in which these bombs were filled was under pressure after the insecticide or other material was placed in the can and the can was sealed. Special filling mechanism and valve were used and the propellant was put in under high pressure but at room temperature.
 
 
 24
 A booklet published by E. I. DuPont de Nemours & Co. in 1951, introduced in evidence, relates the history of aerosol beginning in 1943. The only filling equipment shown therein is plaintiff's filler made under the patent now in suit. Prior to Mojonnier's machine, filling equipment of the piston type had been manufactured for filling by the cold fill method, but this was not satisfactory because of difficulties in controlling the quantity delivered and in operation of the unit.
 
 
 25
 The Mojonnier invention met with commercial success.
 
 
 26
 The district court based its conclusion of invalidity of reissue patent 23,830 on its finding 17:
 
 
 27
 "17. The device disclosed and claimed in the Mojonnier reissue patent in suit is merely an aggregation of elements old in the art which in the aggregation do individually and collectively only what they have always done and nothing more. Each of the elements in the aggregation continues to perform only its own function without modification of the function of any of the other elements due to that association. No new and unusual results are obtained from the device but merely that which would normally be expected from the assembly of an aggregation of old elements."
 
 
 28
 Arguing in support of the district court's action, the Brasile defendants summarize their argument by stating that the alleged new results were old in art and citing Warren Patent 2,515,363, Zsoldos Patent 1,639,679, Engels Patent 2,542,239, Rudd-Melikian Kwik Kafe Coffee Vending Machine, Winton Patent 2,030,951 and Hothersall Patent 2,222,617. We shall hereinafter consider the citations separately.
 
 
 29
 1. It is true that in the prior art are found numerous uses of a float valve for keeping a supply of liquid in a tank or for preventing the liquid from overflowing, but this level is only incidental and is not a factor in measuring the quantity of liquid dispensed through the valve, but instead, the quantity is measured by some extraneous means unrelated to the level of the liquid supply, such as the size or shape of the bottle to be filled, the size of a measuring pot, or the action of some variable pressure means. Also in the prior art practically every patent has a dispensing outlet and valve of some kind; and some patents have time control. But nowhere, except in the claims in suit, is there disclosed a float control for maintaining a "preselected level" in combination with a dispensing valve and a timer as described which jointly produce the function and result, "whereby a substantially constant volume of liquid is dispensed each time the solenoid is operated." This is the "time controlled uniform flow with constant hydrostatic head, orifice and time."
 
 
 30
 The Mojonnier patent points out that the preselected level is the hydrostatic head of predetermined value with respect to the delivery outlet orifice of the valve, the conjoint action of these elements measures the flow of liquid being dispensed, and this, in conjunction with the time control, produces the new result of dispensing a substantially constant volume of liquid each time the device is operated.
 
 
 31
 In this combination Mojonnier utilizes only the body of liquid itself and the dispensing valve, together with time control, to measure and determine the accurate volume of liquid at each operation. The effect of the hydrostatic head which operates upon the orifice is relatively low, in the neighborhood of 11 inches. The low hydrostatic head in a small container and with a predetermined value relation to a given orifice factor has a definite advantage in the matter of facilitating flow, making a slower flow, permitting a large orifice and a slower flow to get the same quantity of material. It has also a definite advantage from the standpoint of splash and foam effect because there would be less.
 
 
 32
 The specific purpose of maintaining a preselected constant hydrostatic head above the valve orifice is not merely to prevent overflow of the tank or to limit the amount of liquid which might run into the tank, which is the situation in toilet tanks controlled by float valves and the many instances of float valves used in the prior art patents; but instead, the float valve maintains a hydrostatic head of liquid with an entirely different idea in mind and having an entirely different purpose and obtaining an entirely different result.
 
 
 33
 Another function of the float valve is to replace the fluid in the small container as it is dispensed. This is the ordinary function of a float valve. Mojonnier's float valve performs an additional function of maintaining a preselected hydrostatic head.
 
 
 34
 The district court, in its memorandum deciding the case,[3] referred in condensed form to eight elements in the reissue patent. Significantly that part of claim 1 reading "whereby a substantially constant volume of liquid is dispensed each time said solenoid is energized" was omitted from the memorandum. Finding of fact 15, prepared by defendants' attorney has the same omission and finding 16 states "each of the elements listed in finding 15 is old, being disclosed in one or more of the following prior art patents and devices". The essential function of the elements is omitted. It serves no purpose to say that in an incomplete listing of the elements of the claim, each element is disclosed in one or more prior art patents. The significant fact is that nowhere in the prior art is there disclosed the combination recited in claim 1, and that this new combination was unobvious in the meaning of the statute[4] and produced a highly beneficial result. This new result, which is omitted from the memorandum and findings of the district court, is due to the conjoint action of maintaining the fluid in the container at a preselected level, a valve for dispensing fluid from the container, and an interval timer for controlling the valve.
 
 
 35
 In their argument in this court, defendants' counsel tacitly admit "that some of the functional language of the claim has been omitted."[5] They seek to justify the omission by referring to the prior art in the record to refute plaintiff's contention that the final clause of claim 1 expresses a new result.
 
 
 36
 Warren 2,515,363 is a patent for a coin-controlled vending machine, the pressure on the beverage in a container being variable and supplied by the gas in the beverage. This results in a variable amount of fluid expelled. While the patent indicates that milk might also be dispensed by the Warren device, it does not appear probable that carbonated milk will be much in demand. The variability of the gas pressure is emphasized by the presence of a relief valve and also a check valve to allow the escape of maximum pressure. Nevertheless Warren's gas pressure varies from 3 to 4 pounds per square inch, as compared to the unchanging pressure in the Mojonnier machine. This variable pressure also would result in inaccuracies in the measurement of repetitive fillings of milk and aerosols.
 
 
 37
 Zsoldos 1,639,679 is a patent for a coin-controlled coffee vending machine. The patent provides no method for maintaining the contents of the coffee receptacle. The liquid level in the reservoir varies from high to low levels with corresponding variation in the hydrostatic head of the liquid, a fact attempted to be compensated by a complicated mechanism.[6] There is no constant hydrostatic head, as in the Mojonnier machine. Zsoldos' machine is complicated, with a varying hydrostatic head of liquid and would dispense a variable quantity.
 
 
 38
 Engels 2,542,239 is a patent for a cake dough or batter depositor. It relates to apparatus into which a mass of cake batter or dough may be introduced and which will discharge the same in predetermined sizes. During the operations the level of the dough in the extrusion chamber drops and the operations then stop while a new supply of dough is delivered to the chamber from a hopper. This phase of the operation is actuated by two electrodes in the extrusion chamber.[7] The chamber does not maintain a constant hydrostatic head and it uses a variable head backed up by air pressure. It is not made for the filling of free-flowing fluids.
 
 
 39
 The Kwik Kafe coffee vending machine, manufactured by The Rudd-Melikian Co., was made and sold prior to the filing of the Mojonnier original application. Upon an offer by defendants, the Kwik Kafe machine was admitted in evidence. They did not, however, show the results of its operation. It was operated by Clarence T. Fishleigh, a witness for plaintiff, who testified in regard thereto. Fishleigh's evidence in that regard was not contradicted. In separate canisters were coffee extract, sugar, and cream, each of which was dispensed by a gravity method into hot water, the containers being at least 14" above a solenoid valve, which operated with a timing device to open or restrict the flow of the coffee, cream and sugar. In referring to the cream canister, expert witnesses for both sides stated that the hydrostatic head in the canister would be higher when it was filled than when it was not completely filled. They differed only as to the extent of the variance, defendants' witness Norman E. H. Deletzke saying, "a little higher" and at another time not "more than probably 10 or 12 per cent variation", and Fishleigh stating that he had made calculations and found that the head would be about 38% more when the canister was full than when it was "empty". While this difference is not significant when the end result is the pouring of hot coffee into a cup for the use of a customer, it becomes important in a machine such as Mojonnier's where an exact amount of milk must be repetitively supplied in accurate measurements into a carton or bottle. If too much milk is furnished, the receptacle will overflow and the officials charged with inspection of sanitary conditions will complain, while, if not enough milk is furnished to fill the receptacle, the officials charged with enforcing short measure regulations will be calling upon the owner of the machine.
 
 
 40
 For these reasons, inter alia, the Kwik Kafe device is not an anticipation of the patent in suit.
 
 
 41
 Winton 2,030,951 and Hothersall 2,222,617 are gravity-operated mechanisms. They dispense an amount of fluid, measured by a built-in measuring pot. Our examination of these patents leads to the conclusion that they are not anticipatory of plaintiff's device.
 
 
 42
 Mojonnier's simple structure measures to a high degree of accuracy each quantity delivered, without depending on the size, shape, or physical structure of the container being filled; it overcomes the many variables in prior methods; and it accomplishes superior results with low cost equipment. The very simplicity of the device makes it relatively inexpensive, practical, accurate, dependable, sanitary and easily cleaned in repetitive production filling operations.
 
 
 43
 That the patent in suit is, or is not, an aggregation of old elements rather than a new combination of old elements is an ultimate fact which must be determined. That the patented device is, or is not, clearly anticipated by prior art, even if considered a combination, is also an ultimate fact. Noble Co. v. C. S. Johnson Co., 7 Cir., 241 F.2d 469, 475. In view of the record before us, as hereinbefore indicated we are of the opinion that finding of fact 17 made by the district court is clearly erroneous and should be set aside. Noble Co. v. C. S. Johnson Co., supra, 475.
 
 
 44
 In Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 181 F.2d 855 at page 857, we said:
 
 
 45
 "Though the District Court may have correctly found that each of the elements in the Yonkers cleaner was old, it does not follow that Yonkers' combination was ipso facto unpatentable, for a novel combination of old elements which so cooperate as to produce a new and useful result or a substantial increase in efficiency is patentable. * * * That the result achieved is both useful and desirable is evinced by the machine's commercial success, attributable, obviously, to the fact that it eliminates inconveniences and disadvantages inherent in the older cleaners."
 
 
 46
 In Blaw-Knox Company v. I. D. Lain Company, 7 Cir., 230 F.2d 373, at page 375, we said:
 
 
 47
 "It is undisputed that the three mentioned elements essential to Bushnell's combination were known to the art. However, it is clear from the evidence that the specific arrangement and placement in combination which he prescribed and embraced in his claims and which, the proof shows, has solved effectually the serious problem that confronted road builders in the use of heavy concrete, had never been suggested. All prior efforts to solve the problem had resulted in ineffectiveness. For the first time in the art, Bushnell demonstrated that his specific placement and prescribed relationship of the three elements in a road building machine furnished a complete answer to the problem. In other words, to our way of thinking, all this produced a new and a useful result which had not been accomplished by any of the workers in the art prior to that time. * * *"
 
 
 48
 It is our opinion that Mojonnier's machine embodies a conjunction or concert of old elements which contributed materially to the sum of useful knowledge in both the dairy industry and the aerosol industry and that the whole exceeds the sum of its parts, Great Atlantic and Pacific Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162, and that the differences between Mojonnier's machine and the prior art are such that his device as a whole would not have been obvious at the time he invented it to a person having ordinary skill in the art. 35 U.S. C.A. § 103.
 
 
 49
 We therefore hold, as a matter of law,[8] that claims 1, 6 and 7 of reissue patent 23,830, are valid, and that, in holding to the contrary, the district court erred.
 
 
 50
 As to the Brasile defendants, the judgment of the district court entered February 21, 1956, insofar as count I was thereby dismissed for want of equity, is hereby reversed and the cause is remanded to the district court for further proceedings not inconsistent herewith, and the court, as a part of said proceedings, should determine the issue of alleged infringement by the Brasile defendants.
 
 
 51
 2. By count III of the second amended complaint, plaintiff charged the Brasile defendants with certain alleged acts of infringement and unfair competition, asserting that the infringement was aggravated. Plaintiff therein asked for treble damages, etc. An answer having been filed, a trial was had before the court. The court did not in that proceeding decide whether there had been an infringement. By finding 19 the court indicated that the question of infringement and validity should have been tried first "in view of the dependence of Count III on Count I." The court concluded as a matter of law that the Brasile defendants had not engaged in any act of unfair competition toward plaintiff. However the court did not set forth a basis of fact for this conclusion. In a filed memorandum, 142 F.Supp. 385, the court stated "that it does not believe there was any unfair competition on either side. The plaintiff owned a patent which it thought was valid and infringed by the defendants. The defendants thought the patent was invalid and that if it was valid that they did not infringe it. Both sides did what human beings usually do under those circumstances, nothing more. So the case is reduced to the simple patent infringement suit, — all that it ever should have been." (Italics supplied.) Whether the italicized words are to be taken figuratively or literally, they express a thought too ambiguous and general upon which to conclude that there was no unfair competition by the Brasile defendants. Because of the variables in human behavior, the court used an unreliable test. We, therefore, reverse the judgment of February 21, 1956, insofar as count III is directed against the Brasile defendants, and the cause, to that extent, is remanded to the district court for a retrial, at which time the court's decision as to infringement should have been made and be available for consideration by the court.
 
 
 52
 3. By said count III plaintiff included the Lewis defendants in the charges made against the Brasile defendants. At the close of plaintiff's case, the district court entered findings of fact and conclusions of law in favor of the Lewis defendants. Accordingly the judgment of February 21, 1956, was favorable to them. In this court plaintiff's attack on the district court's action in this respect is confined to the following point: "The court erred in dismissing the Lewis group of defendants." We cannot say that these findings are clearly erroneous, within the meaning of 28 U. S.C.A. rule 52(a), 28 U.S.C.A., or that the conclusions of law are incorrect. As to the Lewis defendants, therefore, we affirm the judgment of February 21, 1956.
 
 
 53
 4. As to the counterclaim of the Brasile defendants, charging plaintiff with unfair competition, the district court after a trial ordered a dismissal for want of equity as a part of its judgment of February 21, 1956 and the Brasile defendants have appealed therefrom as well as from a provision in said order which failed to allow them attorneys' fees. Both plaintiff's attorneys and attorneys for the Brasile defendants agree here that the district court made no findings of fact relating to said counterclaim. The court contented itself with the language above quoted from its memorandum, 251 F.2d 354.
 
 
 54
 It will be noted that in the counterclaim it is charged that plaintiff "well knowing that defendants' product did not and does not infringe said claims and that said claims are invalid if construed broadly enough to cover defendants' product, have been and still are wrongfully and illegally harassing distributors and customers of defendants * * *." It is obvious that the questions of both validity and infringement are at the basis of this counterclaim. We have held the claims at issue are valid and we are directing the district court to pass upon the charge of infringement. Hence, for these various reasons, the judgment of the district court dismissing the counterclaim of the Brasile defendants must be and is reversed and the cause remanded to that court for further proceedings consistent with this opinion.
 
 
 55
 5. In appeal 11784, the Lewis defendants filed a cross-appeal, and they appealed separately in 11786, contending that the district court erred in not allowing them attorneys' fees.
 
 
 56
 We hold that no error was committed by the district court in this respect. It is provided in 35 U.S.C.A. § 285: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." Continental Art Company v. Bertolozzi, 7 Cir., 232 F.2d 131, 134 and Apex Electric Mfg. Co. v. Altorfer Bros. Co., 7 Cir., 238 F.2d 867, 874.
 
 
 57
 Insofar as the Lewis defendants' cross-appeal in 11784 and their appeal in 11786 are concerned, we affirm.
 
 
 58
 For the purpose of taxing costs in this court, the clerk shall ascertain his fees and the printing charges for the preparation of the printed record covering appeals 11784, 11785 and 11786, as well as the cost of copies of documentary exhibits, under rule 14(a) and (k) effective Oct. 1, 1954, if any satisfactory showing thereof is made, and shall thereupon apportion 85% thereof to 11784, 13% to 11785 and 2% to 11786. We direct that all taxable costs in 11784 shall be apportioned 9/10 thereof against the Brasile defendants and 1/10 thereof against plaintiff; that all taxable costs in 11785 shall be apportioned ½ thereof against the Brasile defendants and ½ against the plaintiff; and all taxable costs in 11786 shall be taxed against the Lewis defendants.
 
 
 59
 In No. 11784: Affirmed in part; reversed in part, and remanded with directions.
 
 
 60
 In No. 11785: Reversed and remanded with directions.
 
 
 61
 In No. 11786: Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The defendants in the above-captioned appeals from the district court are:
 U. S. Dairies Sales Corporation, Purity Pack Corporation, Milk Container Equipment Corporation, Maurice J. Brasile, and Eugene Blum, as a group sometimes herein referred to as "Brasile defendants", and
 U. S. Filler Equipment, Inc., U. S. Carton Forming Corporation, Paper Pack Corporation, Pack Equipment Corporation, and Albert A. Lewis, as a group sometimes herein referred to as "Lewis defendants".
 All, except the individuals named, are Illinois corporations.
 
 
 [2]
 Claim 6 is as follows:
 "6. A filling machine for delivering an accurately controlled predetermined quantity of milk and other free flowing fluids for the repetitive filling of individual milk containers and the like each in a single complete operation, the combination of a relatively large main fluid supply tank; a fluid supply container having a fluid capacity substantially smaller than said main supply tank and larger than the quantity to be delivered in filling said individual containers; said fluid supply container being provided with a bottom delivery outlet having a given orifice factor and area of orifice, through which outlet orifice the fluid freely flows by gravity; a valve in said bottom outlet operable between an open position in which the fluid flows for delivery into an individual container positioned beneath and in filling coaction with said outlet and a closed position for stopping said flow; means operable to deliver said fluid from said main tank to said fluid supply container and to maintain a substantially constant preselected hydrostatic head of the fluid in said supply container, said hydrostatic head having a predetermined value with relation to said orifice factor and area of orifice whereby to effect controlled relatively rapid continuous flow of the fluid from the supply container to the said individual container when the latter is in said filling position; and a timer for controlling the operation of said valve, said timer having a starting switch and operating to control a continuous uninterrupted time period in response to the initial actuation of said switch, said timer controlling said valve to continuously hold open said valve throughout said time period whereby to deliver said predetermined flow and quantity of fluid in a single complete operation to each said individual container and whereby the preselected constant factors of said hydrostatic head in the supply container and said orifice delivery produce relatively rapid filling of said individual container and control of splash effect of the fluid in its discharge into the said individual container, said timer being adjustable to vary said time period and the predetermined quantity of fluid delivered to each individual container."
 
 
 [3]
 142 F.Supp. 385
 
 
 [4]
 35 U.S.C.A. §§ 102, 103
 
 
 [5]
 We said, in Hunt v. Armour & Co., 7 Cir., 185 F.2d 722, 728, that the claims of a meritorious patent should have a liberal interpretation. See, also, Minnesota Mining & Mfg. Co. v. International Plastic Corp., 7 Cir., 159 F.2d 554, 558, where we said:
 "It is urged by appellant that some of the claims are functional. If so, such language is in words of limitation which express the relationship of the structural elements only, and for this reason such claims are not to be considered as functional."
 and Flexwood Co. v. Matt G. Faussner & Co., 7 Cir., 145 F.2d 528, 535, where, speaking of "functional language" in a claim, we said:
 "* * * but the claim in which this language appears is for means sufficiently specified and described in the claim and specifications, and, accordingly, the claim is not invalidated as being for a function by the recital therein of the function to be performed or the result to be served by such means. * * *"
 See also In re Clark, 97 F.2d 628, 25 C.C.P.A., Patents, 1317, at 1322.
 
 
 [6]
 This mechanism includes a supplemental reservoir, float, rod, conical regulating valve, outlet, spring, adjusting screw, magnet, armature, solenoid and electrical structure
 
 
 [7]
 The Mojonnier patent in suit shows a modification of the invention in which, in lieu of using a float valve, two conventional electrodes projected into the interior of the container, are used to control the liquid level
 
 
 [8]
 Noble Co. v. C. S. Johnson Co., supra, 241 F.2d 476
 
 
 
 62
 FINNEGAN, Circuit Judge (dissenting in part).
 
 
 63
 I approve of and concur in this opinion, except as to costs.