**REYNOLDS METALS COMPANY, a corporation, Plaintiff,**

v.

**ALUMINUM COMPANY OF AMERICA, a corporation, and National Can Corporation, a corporation, Defendants.**

No. S 74–172.

United States District Court, N. D. Indiana, South Bend Division.

June 6, 1978.

Franklin A. Morse, II, Thornburg, McGill, Deahl, Harman, Carey & Murray, South Bend, Ind., John W. Malley, William T. Bullinger, Sherman O. Parrett, Cushman, Darby & Cushman, Washington, D. C., John F. C. Glenn, Patent Counsel for Reynolds Metals Co., Richmond, Va., for plaintiff.

John J. Lorber, South Bend, Ind., Robert E. Isner, Richard C. Conover, Nims, Howes, Collison & Isner, New York City, Carl R. Lippert, Legal Dept., Patent Div., Alcoa Center, Pa., Robert T. Teeter, Patent Counsel, ALCOA, Legal Dept., Patent Div., Alcoa Center, Pa., for defendant Aluminum Co. of America.

James H. Pankow, Milton A. Johnson, South Bend, Ind., Walter J. Blenko, Jr., James C. Valentine, Blenko, Buell, Ziesenheim & Beck, Pittsburgh, Pa., Robert A. Stenzel, Corporate Patent Counsel, National Can Corp., Chicago, Ill., for defendant National Can Corp.

FINDINGS OF FACT

CONCLUSIONS OF LAW

OPINION

JUDGMENT

ALLEN SHARP, District Judge.

I.

This Court has determined to include all of the above items in this one document in the interest of clearly stating in one place the factual conclusions and the legal reasons therefore in this protracted and hotly contested case.

This case was tried to the Court without a jury during fifteen trial days by most able and experienced counsel. The Court heard extended oral argument for one full day and has entertained and carefully considered briefs and proposed findings and conclusions.

This shall constitute the findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

Plaintiff Reynolds Metals Company (hereinafter "Reynolds") is a Corporation of the State of Delaware and is a resident of and has its principal place of business in Henrico County, Virginia, Henrico County, Richmond, Virginia, and is the owner and assignee of the United States Letters Patent No. 3,691,972 entitled "Aluminous Metal Articles and Method" which issued on September 19, 1972 in the name of Linton D. Bylund (hereinafter the '972 Bylund patent) and United States Letters Patent No. 3,814,590 entitled "Aluminous Metals Articles and Aluminum Base Alloys" which issued on June 4, 1974 in the name of Linton D. Bylund (hereinafter the '590 Bylund patent).

Defendant, Aluminum Company of America (hereinafter "Alcoa"), is a corporation of the State of Pennsylvania and has a regular and established place of business at South Bend, Indiana, within this district.

Defendant, National Can Corporation (hereinafter "National"), is a corporation of the State of Delaware, and has a regular and established place of business at La-Porte, Indiana, also within this district.

This action arises under the patent laws of United States Title 35, United States Code, and including Sections 271 and 281 et seq.

Jurisdiction is conferred on this Court by Title 28 of United States Code, Section 1338 and is conceded by counsel for the parties.[1]

The acts complained of have been committed, *inter alia*, in the Northern District of Indiana and venue is proper under Title 28, United States Code, Section 1400(b).

---

1. See Section A. of the Pretrial Order filed on March 29, 1978.

The '972 Bylund patent relates to aluminum foil and other articles including drawn and ironed can bodies produced from aluminum base alloys containing up to 2.5% iron and which have a low work hardening rate above 75% reduction and/or which exhibit sufficient ductility at high cold work levels to permit cold working to the extent of at least 90% without the necessity of annealing or stress relieving [PRM 2066][2]. The Bylund patent was based on an application Serial No. 889,790, filed in the United States Patent Office on July 9, 1970, which application was a division of application Serial No. 712,314, filed on January 16, 1968, now United States Patent No. 3,571,910, which application was a division of Serial No. 660,132 which was a continuation-in-part of a now abandoned application Serial No. 573,776, filed in the United States Patent Office on August 8, 1966 and which was in turn a continuation-in-part of a now abandoned application Serial No. 379,782, filed in the Patent Office on July 2, 1964.

The '590 Bylund patent was based on a United States patent application, Serial No. 234,780, filed in the United States Patent Office on March 15, 1972, which is a division of application, Serial No. 889,790, filed in the Patent Office on July 9, 1970, now United States Patent No. 3,691,972, which was a division of application Serial No. 712,-314, filed in the United States Patent Office on January 16, 1968, now United States Patent No. 3,571,910, which was a division of United States patent application Serial No. 660,132, filed in the United States Patent Office on August 11, 1967, now Patent No. 3,397,044, which was a continuation-in-part of a now abandoned United States patent application Serial No. 573,776, filed in the United States Patent Office on August 8, 1966, which in turn was a continuation-in-part of a now abandoned United States patent application Serial No. 379,782, filed in the United States Patent Office on July 2, 1964.

Defendants have answered the second amended complaint and have denied all allegations concerning the infringement of the patents in suit and have also denied the validity of and enforceability of the patents in suit.

Defendant Alcoa has counterclaimed under the patent laws for declaratory judgment of non-infringement, invalidity and non-enforceability, as to each of the patents in suit and has further alleged that Reynolds' assertion and utilization of the patents in suit are violations of the laws of the United States and are contrary to the public policy of the United States. Reynolds has denied these allegations. Defendant National has counterclaimed under the patent laws that the patents in suit are invalid, not infringed, and have been misused and are unenforceable. Defendant National has also counterclaimed under the antitrust laws alleging that Reynolds has sought to monopolize trade and commerce on drawn and ironed cans and unpatented aluminum sheet, a stable article of commerce. Reynolds has denied these allegations.

The chronology of Bylund Inventions and patent applications filed in the United States Patent Office has been provided to the court in graphic form. The Court now adopts the same and incorporates same here as evidenced by the attached appendix A.

## II.

The inventor of the patents in suit, Linton D. Bylund, is a metallurgist who has been working for Reynolds Metals since 1946. He testified and was cross-examined for three or more days at the trial. To the extent that it matters this Court finds Mr. Bylund to be highly credible. During long and vigorous cross-examination by most adroit counsel Mr. Bylund's credibility remained intact. Between 1946 and 1951, Bylund worked as a metallurgist for various Reynolds plants, and in 1951 was transferred to the Metallurgical Engineering Division in Richmond, Virginia. [Tr. 468–470] This Division is a small department, never numbering more than five or six metallurgists, and serves in a corporate staff function.

2. The designation "PRM" refers to Plaintiff's Trial Exhibit numbers.

In 1962, Mr. Bylund was spending the majority of his time working on metallurgical aspects of light gauge aluminum foil. The sales people at Reynolds had asked the Metallurgical Engineering Division to see what could be done by way of making a stronger "Reynolds Wrap", the household aluminum foil being made and sold by Reynolds. Bylund got the idea that an aluminum-iron type alloy might provide just such a stronger foil, and proceeded to have one made to try out the idea. [Tr. 475] The particular alloy he proposed was one called MD79. In experiments with this MD79 it was found that it did not result in any significant increase in the strength of the foil. However, Bylund noted something very unusual and very interesting about this MD79 alloy. As it was rolled down to very light foil gauges, it was found that the MD79 did not work harden normally, and indeed had a zero work hardening rate at high cold work levels around 90% reduction. [Tr. 486]

By April of 1964 Mr. Bylund had discovered that this unusual behavior of the work hardening characteristics of MD79 could be exploited so as to result in more economical foil production. Specifically, he discovered that the MD79 could be rolled down to very thin foil gauge, without resorting to the conventional annealing heat treatments that had been used previously to periodically soften aluminum as it was being rolled. A patent application directed to the use of the MD79 for foil was filed in July, 1964. [PRM 2056] This patent application contained drawings illustrating the unusual zero work hardening rate of the MD79 alloy. As Mr. Bylund testified, and as is apparent from his subsequent actions, his work in the foil area instilled in him a keen interest in the behavior of aluminum alloys at high cold work levels. [Tr. 509–513]

During 1964–1965, Bylund's department at Reynolds had also begun to get somewhat involved in the metallurgical problems that the Reynolds Can Division was having in manufacturing drawn and ironed cans. The Can Division was experiencing low efficiencies in that some of the aluminum alloy sheet received from the Reynolds' rolling mills ran very well in the draw and iron presses and some did not. Work was going forward to isolate and correct the variables in the aluminum sheet that led to the variable performance. Mr. Bylund, along with other members of the Metallurgical Engineering Division, was involved in this work to the extent of serving as liaison between the Reynolds Can Division and the rolling mills that were fabricating the aluminum sheet, and trying to bring in ideas that might help the situation. [Tr. 496–498] The aluminum alloy sheet being used by Reynolds for draw and iron cans at that time was 3004 in a temper known as H320. This temper designation means that the aluminum sheet was subjected to two furnace heat treatments, an annealing furnace treatment during cold rolling and a stress relieving furnace treatment after cold rolling, in order to soften it, i. e., remove the work hardening that occurred during cold rolling. The material was thus of a low cold work level as used for drawing and ironing.

In talking to the people in the Can Division in early 1965, Bylund was continually urging that they investigate work hardening rates at high cold work levels in the draw and iron process. [Tr. 507–513; PRM 1086] Bylund was thus proposing this in writing to Ed Maeder of Reynolds' Can Division in March of 1965 as a way of helping produce drawn and ironed cans with lower cost practices if they could get rid of the heat treatments. Mr. Bylund testified that at that point in time Mr. Maeder and others in the Reynolds Can Division just did not seem interested in his concept. [Tr. 507–513]

In September of 1965, Reynolds appointed a new Director of Metallurgical Engineering, this being a Mr. John Larson. Mr. Larson came from a production background; in fact, he came from being plant manager of one of Reynolds' rolling mills. One of the primary assignments given Mr. Larson by Reynolds' top management was to do something about the problems the Can Division was having, so as to improve the general economic outlook of that division.

As regards Reynolds' can program, Mr. Larson had two concerns. One was improving the fabricating practices used to make the sheet from which the cans were drawn and ironed, so as to have more consistent and better qualities for the severe draw and iron operation. Secondly, Mr. Larson being a production man, and having a production man's concern with making a product and selling it at a profit, he was concerned about the basic economics of the can Reynolds was making and selling.

Reynolds did have on-going programs at that time aimed at a lighter weight can using very highly alloyed aluminum sheet. Such sheet gets its strength through alloying. It still was the practice to give such sheet the heat treatment prior to the draw and iron operation. These high strength alloys were primarily programs of the Reynolds Research Division, known as MRD, which stands for Metallurgical Research Division.

While the entire Metallurgical Engineering Division under Mr. Larson's guidance was looking at and trying to help solve some of the problems of variability in the sheet material that was being used by Reynolds for drawing and ironing, Mr. Larson specifically assigned one of his own men, Mr. Bylund, to spend the major portion of his time looking into the whole draw and iron process and seeing what could be done about the economics. Mr. Larson secured the Can Division's approval for Mr. Bylund to have access to the draw and iron press at the Can Development Center (CDC).

Mr. Bylund's keen interest in the concept of using highly cold worked materials, which stemmed from his work in connection with rolling foil, prompted him to take some sheets of the MD79 foil alloy that he had evolved, and which had been fabricated without any of the conventionally mandated special furnace heat treatments to soften it, and to try drawing and ironing a can out of this highly cold worked material. [Tr. 517]. To his surprise, this aluminum alloy sheet that had *not* received any of the special softening heat treatments formed into a very good looking can on a conventional draw and iron press of the type that Reynolds was using in its can plants. [Tr. 519–520].

This was highly significant—and Bylund knew it. He knew that this foil alloy did not have enough alloying elements in it, such as manganese, magnesium, etc., to make a draw and iron can of suitable commercial strength, even in its highly cold worked condition. He was astute enough, however, to realize that something surprising and very significant had occurred. He realized that "the door was open" to the possibility of using a higher alloyed aluminum sheet without giving the aluminum sheet the traditionally required heating or softening treatments in the furnace prior to making a drawn and ironed can therefrom. [Tr. 520]. His concept was that aluminum alloy sheet which had a low work hardening rate could be rolled without any of the traditional intervening heat treatments during or following cold rolling to soften it and would still withstand the severe drawing and ironing in a conventional draw and iron press without any thermal treatments. The potential savings were truly enormous.

The first thing Mr. Bylund had to do was find out which types of aluminum alloys in a highly cold worked temper would act this way. Therefore, with Mr. Larson's blessing, he embarked on a program to develop this concept to a full commercial reality. Bylund's initial approach in this development work was to use aluminum alloys in highly cold worked condition for drawing and ironing into cans with the aluminum alloys being selected on the basis of their known ability to be rolled down in cold rolling mills to over 90% cold working reduction without splitting or tearing apart. [PRM 2090; Tr. 521–523]. Thus in addition to the specially evolved foil alloy (known as MD79) from which the first drawn and ironed cans were made from highly cold worked material, Mr. Bylund's initial work, as shown in his report dated February 1, 1966, comprehended making cans from an alloy registered with the Aluminum Association under the number 1235,

as well as a series of stronger registered alloys, such as 3003, 3005, and 3004. [PRM 2090].

In August of 1966, a second patent application was filed in Mr. Bylund's name, which was a continuation-in-part of the earlier 1964 application on MD79 foil. [PRM 2057]. It repeated the earlier disclosure and drawings on MD79 foil, and added new disclosure on a wider range of iron content for MD79 and that highly cold worked MD79 that had not received any of the conventional thermal softening treatments could be drawn and ironed into cans, also without any intervening thermal treatments.

Meanwhile, Mr. Bylund's further work on his concept of using highly cold worked aluminum alloy sheet for drawing and ironing without any thermal treatments was going forward toward a commercial reality. During 1966 and 1967 this work entailed not only working with the iron-containing common aluminum alloys such as 3003, 3005 and 3004 that are registered with the Aluminum Association, but also creating and modifying alloys, all in an effort to find the best commercial form for utilization of the concept. One of the areas that Bylund was pursuing as far as creating new alloys was adding manganese and magnesium to an MD79 type alloy to strengthen it. Various versions of such an alloy, which was called MD112, were experimented with throughout 1966 and 1967 in addition to the common, registered alloys.

In May of 1966 and again in December of 1966, Mr. Bylund issued additional progress statements on his investigations of drawing and ironing cans from a variety of alloys in the highly cold worked H19 temper, some being high in iron, i. e., MD112, and others being registered alloys having somewhat lower iron limits, i. e., 3003, 3005, 1100. [PRM 2108, 2132].

At this time Mr. Bylund was still primarily interested in using a high iron content alloy in an H19 temper for draw and iron can stock. One reason for his preferring iron is that it is intrinsically a cheaper alloying element that is manganese or magnesium. Additionally, a high-iron content alloy would be beneficial from the standpoint of recycling aluminum. [Tr. 1346–1348]. In recycling aluminum, the recycled aluminum inevitably ends up containing a higher percentage of iron than it did before it was recycled. This is due to the unavoidable inclusion of some iron impurities in aluminum products gathered for recycling. If the aluminum was used for i. e. can stock in a high iron content alloy it will be more tolerant of the use of this recycled aluminum.

In keeping with the preference for a high-iron alloy, it was decided to try a production evaluation of the MD112 high iron alloy for drawing and ironing can bodies.

Bylund prevailed upon the Can Division of Reynolds to allow a commercial production evaluation run of drawn and ironed cans at Reynolds' White Bear Lake can plant made from sheet in accordance with Bylund's work. The sheet had not received any anneals, stress reliefs or any other softening heat treatments. This commercial production evaluation run was carried out in February of 1967 and in excess of 130,000 can bodies were drawn and ironed from this material on commercial equipment, operating at commercial speeds. [PRM 2145]. These over 130,000 can bodies were later filled with Hamm's beer and performed satisfactorily. [PRM 2146]. At this point in time it was clear that Mr. Bylund's concept of utilizing aluminum alloy sheet that had not received any of the softening heat treatments during or after cold rolling was not only technically feasible from the standpoint of being able to do it in a laboratory, but was also commercially feasible from the standpoint of running smoothly on conventional existing equipment at commercial speeds and efficiencies.

Mr. Bylund's experiments with drawing and ironing a variety of alloys in H19 temper were meanwhile continuing. It should be recalled that Bylund's February 1, 1966 report had suggested that future work include an evaluation of drawing and ironing can bodies from 3004–H19. On April 13,

1967, Mr. Bylund did successfully draw and iron cans from 3004–H19. Mr. Byland had enough 3004–H19 to make 24 cans and cups, and some of the drawn and ironed can bodies were subjected to buckling tests. [PRM 2160]. The test results were very encouraging because they showed that the can bodies made from 3004–H19 were able to stand an internal pressure on the order of 130psi, as opposed to around 90psi for MD112–H19 or 3004–H320. This implied the possibility of being able to form drawn and ironed cans from 3004–H19 in a thinner gauge than had been previously utilized, which portended great economic savings in the form of being able to make a lighter draw and iron can.

In April of 1967, Mr. Bylund again discussed the program of alloy investigation for potential D and I base stocks with Mr. Larson of Reynolds Metals' Metallurgical Engineering Department and with Mr. Gidley, the Can Division metallurgist. They jointly agreed on the direction the program should take, as reflected in a report prepared by Mr. Gidley on April 19, 1967. [PRM 2160]. That report recommended that Reynolds Metals:

"1) Continue the MD–112 evaluations as originally planned, but accept this alloy as the lower limit.

2) Initiate a program to further evaluate 3004 in the H–19 temper. Determine whether or not this alloy represents the upper limit.

3) Select an intermediate alloy and evaluate its capabilities."

During the week of August 3–11, 1967, Reynolds Metals evaluated at its Equipment Center the various alloys under consideration for D and I stock, which included MD112–H19 and 3004–H19. The results of this evaluation are contained in a report written by Mr. Gidley on September 7, 1967 [PRM 2179]. Over 100,000 3004–H19 cans were made during this period and were later filled and seamed by bottlers.

By the end of August, 1967, Mr. Bylund's MD112 type alloy and the 3004 type alloy were the only two alloy systems that were under active consideration by Reynolds' Can Division for commercial application of Mr. Bylund's concept. When aluminum sheet made in accordance with these alloy systems is drawn and ironed into can bodies with the aluminum sheet not having received any anneals or thermal treatments so that it remains in a highly cold worked condition, drawn and ironed cans made from each of these alloy types perform satisfactorily. Both alloys contain enough alloying elements to provide adequate strength and both have enough iron to provide a die polishing effect on the draw and iron tooling.

Cans made from the MD112 type allow systems are a little bit cheaper in that the basic alloy itself is a little bit cheaper than 3004. On the other hand, cans made from the 3004 type alloy system provide a little more strength in the finished can than those made from MD112. [PRM 2197]. The Can Division of Reynolds opted in 1968 to produce cans commercially from a 3004 type alloy system in highly cold worked condition and to discontinue considering MD112 for commercial draw and iron considerations. A 3004 type H19 alloy is still used today by Reynolds.

In the midst of the first large scale production evaluations of 3004–H19 (and the third for the MD112–H19) that were taking place during early August, 1967, the third Bylund patent application was filed. This was application Serial No. 660,132 filed on August 11, 1967, which was filed as a continuation-in-part of the earlier second application which had been filed in August of 1966. This third application repeated the drawings and disclosure of the earlier applications relating to the unusual work hardening rate of the MD79 Aluminum-Iron alloy in foil applications, and also to the use of the MD79 alloy in highly cold worked condition, for forming drawn and ironed can bodies without any anneals or thermal treatments. In addition, this third patent application contained a broad, additional disclosure and claims relating to the basic concept of Bylund of cold rolling any of a variety of aluminum alloys into sheet and then drawing and ironing the sheet into a

can body with the cold rolling and drawing and ironing operations being performed without the intervention of a thermal treatment. Thus, the application provided [PRM 2058, page 15] that:

"In accordance with the invention, and in keeping with the foregoing considerations, it has been found that aluminous metal of various types may be subjected to a fabricating operation which involves the steps of:

(a) hot rolling the metal to a hot line gage suitable for single or multi-stand cold rolling, such as between about 0.100" and about 0.250";

(b) rolling the metal from hot line gage in one or more cold rolling passes into coilable sheet stock of a thickness on the order of 10–20% of the hot line gage;

(c) forming the cold rolled sheet into a finished article, such as by drawing and ironing to effect a further reduction of about 65% (the total cold working reduction from hot line gage being in excess of 90%);

(d) performing the cold rolling and forming operations without the use of a thermal treatment at any thickness of the metal below about 0.100", the metal being work-hardened in the course of such operations and still retaining sufficient ductility for finishing steps such as necking or flanging of can bodies."

Claims were also presented in this application to a method involving the above steps without any alloy limitations other than that they have a low work hardening rate in the region above 75% reduction and sufficient ductility at high cold work levels to permit cold working to the extent of at least 90% without the necessity of annealing or stress relieving the metal. These were presented as original Claims 30–39 [PRM 2058, pp. 28–31]. These claims are the ones that ultimately issued as Claims 1–10 of the '972 patent in suit with some minor amendments by way of thickness limitations and specifying forming a hollow article.

The 660,132 application also contained additional specific disclosure of and claims to the new MD112 type of alloy, containing not only iron but manganese and magnesium as well. Thus the specification provided [PRM 2058, p. 16]:

"It has also been discovered that the beneficial effects of relatively high iron content in the essentially binary aluminum—iron alloys previously mentioned, particularly in reducing the work hardening rate, are applicable with respect to alloys containing additional alloying elements such as magnesium, manganese, or both.

\*    \*    \*    \*    \*    \*

In accordance with this alloy aspect of the present invention, typical alloy systems are  .  .  . ."

In addition, specific examples 11–17 were contained in the third patent application, these being examples of different MD112 type alloys of varying percentages of iron, magnesium and manganese. These MD112 type alloys were specifically claimed in original claims 22–28, with the limits of their alloying constituents being there delineated.

The 660,132 application as filed contained claims directed to:

(1) Aluminum foil made from the various high iron content alloys [Claims 1–4]

(2) A wrought aluminum article made from the various high iron content alloys [Claims 5–12]

(3) A method of making wrought aluminous metal articles from the highly cold worked high iron content alloys without any annealing or thermal treatments [Claims 13–21; Claim 20 specifically relates to drawing and ironing can bodies]

(4) The novel high iron content alloys themselves [Claims 22–28]

(5) A drawn and ironed can body made from a highly cold worked aluminum alloy including iron [without specifying a percentage] as an alloying element [Claim 29]

(6) The method of making articles from any aluminum alloy including cold rolling the aluminum to a greater then 75% reduction and then con-

ducting a forming operation including imparting additional cold working to the extent of at least 90%, all without any thermal treatments. [Claims 30–39; Claims 34–39 related specifically to drawing and ironing can bodies from highly cold worked aluminum sheet.]

When the Patent Officer Examiner considered the application Serial No. 660,132, he determined that there was more than one separate and distinct invention being claimed, and accordingly, as provided by Patent Office practice, he issued a requirement for restriction between Group I claims pertaining to wrought articles and alloys [Claims 1–12 and 22–29] and Group II claims pertaining to a method of making wrought articles [Claims 13–21 and 30–39].

As a result of the restriction requirement Claims 13–21 and 30–39 [the method claims] were cancelled from this application and were refiled in the divisional application Serial No. 712,314 on January 16, 1968 [PRM 2059]. The remaining claims in application Serial No. 660,132 were meanwhile allowed and issued in Patent No. 3,397,044 on August 13, 1968.

The divisional application Serial No. 712,314 thus contained all method claims, with the claims falling roughly into two groups. One group of claims (13–21) are directed to alloying aluminum including adding iron within a specified percentage range and cold rolling, with some of this group of claims specifying drawing and ironing. The other major group of claims (30–39) were not restricted to any particular kinds of alloys but rather related broadly to a method involving cold rolling aluminum sheet to specified reductions [with no annealing] and drawing and ironing can bodies therefrom. This application also was made subject to a requirement for restriction by the Patent Office. The broad method claims not restricted to any particular alloy were cancelled from this application and refiled in a further divisional application Serial No. 889,790 on July 9, 1970. The remaining claims in Serial No. 712,314,

which pertained to specific high iron alloys, were allowed and issued as Patent No. 3,571,910 on March 23, 1971.

The divisional application Serial No. 889,-790 [PRM 2060] was filed on July 9, 1970 with the non-elected method claims of the earlier application [along with five other new method claims * directed to the same invention]. A pre-examination amendment filed May 10, 1971 [PRM 2060, page 34] added seven article claims directed to a drawn and ironed can body made from an aluminum alloy containing 0.75–2.5% iron. Again, there was a further requirement between the broad method claims, unrestricted to any particular alloy, and the article claims directed to drawn and ironed can bodies made from the particular novel alloys containing .75–2.5% iron. The Examiner full well appreciated that the broad method claims were not restricted to any of the particular novel high iron containing alloys which had been disclosed and claimed. In his requirement for restriction [PRM 2060, page 44] the Examiner noted that:

"The method of fabricating recited in the Claims 1–15 could be used in making can bodies having a different composition than that claimed in Group II. For example the metal might contain 4% iron."

Thus, the Examiner was fully aware that the broad method claims were not restricted to using any of the specifically disclosed novel high iron content alloys.

In response to the requirement for restriction in application Serial No. 889,790 [PRM 2060], the article claims directed to a drawn and ironed can body made from an aluminum alloy were cancelled from this application and refiled in a further divisional application Serial No. 234,780 on March 15, 1972 [PRM 2061]. The broad method claims in Serial No. 889,790 were allowed and issued in Patent 3,691,972 on September 19, 1972. This is one of the patents in suit in this litigation.

The claims in the further divisional application Serial No. 234,780 to a drawn and

* These claims issued as Claims 11–15 of the '972 patent and do not contain any alloy limitations.

ironed can body made from an aluminum alloy having particular alloying elements and being cold worked to specified degrees, were amended on August 22, 1973. Whereas the previous claims had specified the aluminum alloy of the drawn and ironed can body as having 0.75–2.5% iron and had characterized the alloy as exhibiting sufficient ductility to permit cold working to the extent of at least 90% without the necessity of annealing or stress relieving, the amended claims positively recited the wall of the drawn and ironed can body as being cold worked to the extent of at least 90% and characterized the aluminous alloy as containing "up to 2.5% iron in an amount sufficient to prevent die pick-up from interfering with the drawing and ironing operations." The language "up to 2.5% iron" was not any new matter. That language appears in the Abstract of the Disclosure of the Application Serial No. 660,132 [PRM 2058, p. 1], which was filed on August 11, 1967.

These amended claims were presented as claims of the type that issued as Claim 26 of Patent No. 3,397,044 [PRM 2058], issued August 13, 1968. That Claim 26 simply specifies the presence of iron as an alloying element, without specifying any particular percentages. Thus, Claim 26 in the 1968 '044 is broader than the claims presented in the August 22, 1973 amendment and which issued as Claims 1–6 of the '590 patent. This was pointed out to the Patent Office [PRM 2061, p. 30]. Method claims were also presented claiming the method of making the articles. With respect to the method claims (which issued as Claims 7–13 of '590 patent) Bylund's attorney explained as follows: [PRM 2061, pp. 40–41]:

> "Thus, for example, the claims of 3,691,-972 have no alloy limitations; and the claims of 3,571,910 are directed to methods involving essentially binary Al–Fe alloys (see claims 8 and 9 of that patent as to can making aspects). With respect to alloy aspects of the present invention, claims [1–13] are intended to be broad enough to cover making drawn and ironed can bodies from work hardened

sheet of various standard aluminum base alloys including 3004, an alloy which has been widely used for cans, but previously either not for drawing and ironing, i. e. only for making seamed containers, or for drawing and ironing either in 0-temper or intermediate tempers of the type normally obtained by stress relieving the cold rolled sheet".

Because of the similarity, and to obviate a rejection on the basis of double patenting, a terminal disclaimer was entered in this application, disclaiming that portion of the term of the patent to issue which would have extended beyond the expiration date of Patent No. 3,397,044. Thereafter Patent No. 3,814,590 issued on June 4, 1974. This patent is also one of the patents in suit in this litigation.

In this trial evidence of ex parte tests which were made during its course was offered and admitted. Notwithstanding their receipt into evidence this Court takes a very dim view of same and does not here deem them as helpful or relevant. This view is apparently shared by others. See *Illinois Tool Works, Inc. v. Foster Grant Co.,* 547 F.2d 1300 (7th Cir. 1976), and *Popeil Brothers v. Schick Electric, Inc.,* 356 F.Supp. 240 (N.D.Ill.1972).

### III.

Under *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 556 (1966), the following basic factual inquiries are to be resolved.

#### 1. Scope and Content of Prior Art

The articles, patents and trade literature published at the time the inventions here were made all suggested going soft in conventional drawing and ironing. Additionally the activities of those in the trade all supported going to soft tempers. Alcoa actively published its claim to being the first to draw and iron H19 temper sheet without an intermediate anneal prior to this lawsuit.

## 2. Level of Ordinary Skill

Since the "level of ordinary skill" in a particular art has not usually been defined in writing, the usual way of determining such level is by referring to the subjective reaction of a person thoroughly familiar with the particular art and, if possible, one who practiced the art at the crucial time in question, *Malsbary Mfg. Co. v. Ald, Inc.*, 447 F.2d 809, 171 USPQ 7 (7th Cir. 1971).

The persons of ordinary skill in drawing and ironing aluminum alloy sheet for beer and beverage cans at the time the Bylund inventions were made included persons from Reynolds, Alcoa and National, as well as from Kaiser, CCC, American Can Co., and Coors. Their background included people actually making D&I aluminum cans; those in packaging development; and those in related managerial roles. There were also several people who possessed *more* than ordinary skill in the art as they held patents relating to the field. These would include Mr. Maeder and Mr. Sandor for Reynolds; and Mr. Close, Mr. O'Brien, Mr. Lake, Mr. Dunn, Dr. Anderson, and Mr. McBride for Alcoa.

Mr. Larson testified that the Reynolds' Can Division wanted softer alloys. Mr. Larson thought that flange annealing would allow high strength alloys in soft tempers to be used. He realized after learning of the Bylund inventions that the way to go was to use all of the strength from cold rolling—which was free—and then add just enough alloying elements for strength, without adding too much so that a can could not be formed. Mr. Maeder believed that H32 was the highest temper that the D&I process could tolerate. He was a patentee and a person of more than ordinary skill in the art. So was Mr. Sandor, who suggested using certain high strength alloys and stress relieving them. Mr. Gidley, Mr. Householder, Mr. Shockley, and Mr. Burleson all went along with H32 temper. All testified to the effect that they were surprised when they learned from Bylund that H19 tempers could be used.

At Alcoa, the plan was to use high strength alloys (PRM 2527) in "0" tempers (PRM 2533). When this decision was made Dr. Anderson, Mr. Blake, Mr. Schaffer and Mr. Wolff, among others, participated in, and Mr. O'Brien and Mr. Lake were informed of, the alloy selections. None of these persons suggested using H19 tempers. Mr. Lake, also a patentee, on May 12, 1967, had in fact informed CCC that the present specification for D&I cans was 3004–0 and that higher strength magnesium alloys were expected to be more attractive (PRM 2674), which would be 5056 and 5082 in "0" temper (PRM 2533). Dr. Anderson, Mr. O'Brien, and Mr. Lake all hold United States patents and are persons of more than ordinary skill in the art. The program went forward with the high strength "0" temper alloys (PRM 2533), Mr. Wolff was by June 27, 1967, to do the first phase of the project and make cups from the "0" temper alloys selected (PRM 2547). His work order is dated July 7, 1967 (PRM 2630). Actually, Alcoa was heavily into impacting as the best way to go (PRM 3187).

It was after Reynolds' order from Alcoa of 10,000 pounds of 3004–H19 for D and I in July of 1967, that Mr. O'Brien had the first sample prototype cans made at Alcoa from 3004–H19 (albeit with the aid of a torch). The record shows what the reaction was of the people of ordinary (and extraordinary) skill in the art of Alcoa.

Mr. Close, an inventor himself of aluminum cans (PRM 2624), reported to Mr. O'Brien "Congratulations, I didn't think you could get there with the Drawn Iron process" (O'Brien Dep. Tr. 162). Mr. Close immediately shut down Alcoa's impact operations (PRM 2555) upon which Alcoa had spent millions of dollars (O'Brien Dep. Tr. 144). Mr. Dunn of Alcoa later claimed as an integral and important part of an invention of his in a patent application first filed in September of 1969 the use of H19 temper without heat treatments during drawing and ironing, and received patents (see PRM 2063 and 2064). Indeed, in prosecuting these Dunn patents the Patent Office was told that the prior art taught away from using H19 without heat treatments for

drawing and ironing (PRM 2063 amendment of February 2, 1973). Mr. Sands, who confirmed the Reynolds Order for 3004–H19 D&I can stock (PRM 2831), regarded the use of H19 temper for D&I as a "major move" (PRM 2559 & 2560), one which enabled aluminum cans to leap-frog into a preferred position (Sands Dep. Tr. 85). Mr. O'Brien hailed it as the "first 'major step'", and recommended that Alcoa "immediately accelerate" the Alcoa development program (PRM 2550).

It is interesting to note that by August 10, 1967, even before Alcoa had made any of its prototype 3004–H19 cans, that Alcoa was pushing Coors to try H19 (PRM 2180). By August 25, 1967, Mr. Sands advised Mr. O'Brien in connection with O'Brien's August 17, 1967 letter reporting that prototype 3004–H19 cans had been made to "strike while the iron is hot" and produce 20,000 cans (PRM 2554), and by September 13, 1967, Mr. Sands needed two Alcoa cans filled with beer to "tip" CCC and American Can Co. (PRM 2555).

As seen from the above, those persons having a level of ordinary or above ordinary skill all had knowledge of aluminum drawn and ironed cans and included metallurgists (e. g., Gidley, Larson, Sandor, Householder, McBride & Peak), tooling and machinery persons (e. g., Maeder, Gidley, Dunn and unnamed persons at Coors and Kaiser), scientists (e. g., Dr. Anderson, Dr. Dedrick), aluminum sheet mill people (e. g., Larson, Nielsen) and aluminum packaging people (e. g., Sands, O'Brien, Lake, Gidley, Maeder). But only Mr. Bylund discovered that a D&I can could be made without intermediate anneals.

### 3. Differences Between The Prior Art and The Claims in Issue

There exists two principal and substantial differences between Mr. Bylund's inventions and the prior art:

(1) The elimination of annealing or stress relieving in the process of making drawn and ironed aluminum cans from the beginning of cold rolling through the ironing operation; and;

(2) The making of aluminum alloy sheet by selecting the amount of alloy elements to achieve sufficient ductility and strength to be able to cold roll and draw and iron same into a can body without thermal treatments.

The claims of the 3,691,972 patent (PRM 2066) are all concerned with the method of making can bodies (Claims 1–15) and the claims of the 3,814,590 patent (PRM 2067) here in issue, are all concerned with can bodies (Claims 1, 2, 5 & 6) and the methods of making the can bodies (Claims 7–13). The differences recited above are defined in these claims and are disclosed in the specification in columns 7 and 8 of the 3,691,972 patent (PRM 2066), and in columns 6, 7 and 8 of the 3,814,590 patent (PRM 2067).

### 4. The Nonobviousness of the Subject Matter As A Whole At The Time The Inventions were Made Because of The Differences Between The Prior Art and The Subject Matter

The inventions in issue are nonobvious because Mr. Bylund went opposite to the direction the art was going at that time in two significant respects:

(1) The art was going to high strength alloys in "0" temper to gain strength, whereas Bylund was going to H19 temper sheet;

(2) The art was going to higher alloy content to achieve strength, whereas Bylund was going to temper to achieve strength with alloying content being whatever was necessary to make a satisfactory can.

History shows that the Bylund approach was correct and the prior art approach was not. The conclusion of nonobviousness is buttressed by the evidence relative to the secondary tests to be considered as set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, and repeated in *Trio Process Corp. v. L. Goldstein Sons, Inc.*, 461 F.2d 66 (3d Cir. 1972), cert. den. 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). These tests include the commercial success of the aluminum industry with draw and iron cans utilizing highly cold worked alu-

minum sheet without anneals or heat treatments, filling the long-felt and acutely-felt need of making a light weight aluminum can to compete with TFS cans, and the failure of others to develop the invention or solve the problem, although they had all the incentives in the world to do so. There is also the copying of the Bylund invention, coupled with defendants' public praise of and claiming credit for the invention, and Alcoa's filing of a patent application claiming what Bylund had done as an integral and unobvious part of an Alcoa invention.

The list of advantages and secondary considerations of the Bylund inventions over the prior art includes:

(1) aluminum D&I cans were made competitive with TFS in the industry;

(2) The draw and iron method swept the industry free of all other methods;

(3) H19 temper D&I sheet swept the industry free of all other tempers;

(4) The draw and iron aluminum can rose from nothing in the industry to capture over 50 percent of the market by 1976;

(5) Alcoa sales of H19 D&I stock rose from the 10,000 pounds ordered by Reynolds, which was the whole of Alcoa's 1967 sales, to 8 million pounds in 1970, to 235 million pounds in 1974;

(6) Alcoa's sales of "0" temper D&I stock fell from 21 million pounds to less than a million pounds over the period of 1970 to 1974;

(7) National's business in aluminum cans went from zero in 1967 to being the leading manufacturer by 1974;

(8) costly intermediate anneals were eliminated;

(9) only Bylund solved the problem of the struggle with TFS in the industry;

(10) only Bylund was able to satisfy the need in the industry for an aluminum can to compete with TFS;

(11) all of the industry failed to beat TFS with the impact method or with high strength alloys in "0" temper;

(12) the weight of the aluminum can was drastically reduced;

(13) costly intermediate handling of coils and storage was eliminated;

(14) unexpectedly, tool life was found to be better with H19 temper than with "0" temper sheet;

(15) Alcoa heralded use of H19 D&I stock as a major achievement;

(16) Alcoa filed and received a patent which emphasized that the use of H19 in drawing and ironing without any anneals or heat treatments was an unobvious invention;

(17) National lauded its can in its advertising as the "dynamic new can".

Courts have recognized an infringer's praise of the patented invention in its advertising as significant on the question of unobviousness. See, for example, *AMP Inc. v. Molex Prod. Co.*, 329 F.Supp. 1364, 1371, 170 USPQ 2, 7 (N.D.Ill.1971); *W. R. Grace & Co. v. Park Mfg. Co.*, 378 F.Supp. 976, 979, 181 USPQ 490, 493 (E.D.Ill.1974); and *Tracor, Inc. v. Hewlett-Packard Co.*, 365 F.Supp. 558, 182 USPQ 340, 359 (N.D.Ill. 1973), affirmed 519 F.2d 1288 (7th Cir. 1975).

Not a single person having ordinary skill in the art testified at trial that the Bylund invention was obvious at the time it was made, see *National Dairy Prod. Corp. v. Borden Co.*, 394 F.2d 887, 890, 157 USPQ 227, 229–230 (7th Cir. 1968). Mr. Nielsen candidly admitted at trial that the Bylund invention was something that people skilled in the art thought could not be done and that such people would have been impressed. The patents in suit satisfy all the statutory and case law indicia of significant and unobvious invention, and should be upheld. A recent comment by Judge William C. Conner is pointedly relevant:

"When the evidence establishes that a number of persons skilled in the art, having access to all the necessary means and facilities, actually attempted over a substantial period of time to solve a problem and were unable to do so, I simply don't see how a court, merely on the basis of

hindsight, can say that the solution was obvious to such persons at the very time they were searching vainly for it." *American Patent Law Association Bulletin,* October–November 1977, pp. 618–627

Defendants cite five instances of alleged prior knowledge by others and two alleged anticipatory publications as rendering the patents in suit invalid (DPT Br. pp. 7–8). Under the applicable law these defenses are insufficient under 35 U.S.C. §§ 102(a), (b), and 103.

Defendants have failed to show that the claimed *inventions* were *publicly* known by others before Bylund, as required under 35 U.S.C. § 102(a). *Gayler v. Wilder,* 10 How. 477, 51 U.S. 477, 13 L.Ed. 504 (1850); *Soundscriber Corp. v. United States,* 360 F.2d 954, 175 Ct.Cl. 644 (1966); *Connecticut Valley Enterprises, Inc. v. United States,* 348 F.2d 949, 172 Ct.Cl. 468 (1965); *In re Borst,* 345 F.2d 851, 52 CCPA 1398 (1965). The evidence cited by defendants merely shows instances of non-public letters or memorandums or incomplete experimental can bodies of uncertain origin and material of Reynolds, Alcoa, or Metal Flo which fail to show the claimed *inventions* were in prior use by others, see *Illinois Tool Works, Inc. v. Continental Can Co.,* 397 F.2d 517, 519–520 (7th Cir. 1968); and *Illinois Tool Works, Inc. v. Solo Cup Co.,* 461 F.2d 265, 270 (7th Cir. 1972). These instances were experimental, incomplete and long forgotten and abandoned when defendants attempted to make a drawn and ironed can (PRM 2533 & 2996). The evidence showed that Bylund acted independently and was without knowledge of these alleged instances when he made his inventions.

### 5. Prior Knowledge By Reynolds

As to Reynolds, defendants argue that in 1964 Reynolds had drawn and ironed cans, on production type tooling, from a 3004 type alloy that had been cold reduced up to 75 percent (DF 89), citing a single document (DA 2614). This is an internal private Reynolds document which expressly states an *"experimental"* 3004 *"type"* alloy was drawn and ironed. It does not disclose Mr.

Bylund's inventions of cold working in excess of 90 percent. The document concludes, "The problem of forming the flanges . . . remains to be evaluated." No further work was done. This work was clearly incomplete and also abandoned. Mr. Bylund testified that he did not know about it. (Tr. 897 & 898). Internal experimental work, incomplete on its face, which fails to disclose the invention, and which never went forward and concerning which no witness is called, is not prior knowledge which could anticipate the Bylund's inventions, *Illinois Tool Works, Inc. v. Continental Can Co.,* 397 F.2d 517, 519–520 (7th Cir. 1968). It added nothing to the useful arts and fails as a defense.

### 6. Prior Knowledge by Alcoa

Counsel for Alcoa disavowed any claim whatsoever at trial that someone at Alcoa invented the claimed subject matter prior to Bylund (see e.g., Tr. 48):

[Alcoa Counsel]: This isn't a priority contest between Reynolds and Alcoa, you Honor, although they're trying to make it so, as much as Reynolds would like to make it so.

THE COURT: It's not a race to the Patent Office?

[Alcoa Counsel]: No . . .

Notwithstanding the above, the defense is without substance when examined on its merit. Alcoa's work was incomplete, experimental, using partially annealed temper sheet, which didn't meet the Bylund inventions, and which was *"dropped"* in favor of impact according to Alcoa's own employee (Quade Dep. Tr. 13–14) and *resurrected* solely for this law suit. Alcoa actually picked up discarded cups out of the scrap heap for this defense (Quade Dep. Tr. 94–95 and 99–100):

"Q. I believe you indicated that the cups had been thrown out or scrapped and you got an inquiry from Alcoa counsel; is that right?

A. Yes, sir.

Q. And then you sent a technician out to pick them out of the scrap?

A. Yes, sir." (Quade Dep. Tr. 99–100)

As stated in *Reynolds v. Whitin Mach. Works*, 167 F.2d 78, 83 (4th Cir. 1948):

" . . . Patents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments."

### 7. Prior Knowledge by Metal Flo

This work was also incomplete, experimental and abandoned. (Garner Dep. Tr. 123–124). The cans were not successful and were never filled and tested. Mr. Gardner testified that the Metal Flo process for beer cans was "not mechanically or technically sound, that approach, and the thing just kind of died in a writhing, agonizing death" (Gardner Dep. Tr. 125). Further, the Metal Flo process is in the Massingill patent and was considered and rejected by the Patent Office (Grigorenko Dep. Tr. 78, 85).

### 8. Prior Knowledge from Metal Flo Meeting

Knowledge from the Metal Flo meeting rises no higher than item (3) above. Only about 45 minutes were spent with Metal Flo at the meeting (Brown Dep. Tr. 59–60) as it later learned that the Metal Flo process for beer cans was a "disaster" (Reynolds Dep. Tr. 38–39). Further, Mr. Maeder, in 1974, wrote that Reynolds was the first to draw and iron H19 temper sheet (PRM 2234). In any event, neither Bylund nor Palmer, his attorney, knew about Metal Flo (Tr. 681, 904 and 1086 and Palmer Dep. Tr. 178).

### 9. The Prior Art of D&I Cans from 3004–O and 3004–H32

Defendants argue that "no conceptual problem" was involved in going from "0" to H32 temper and that therefore there would be "no conceptual problem" to go to H19 (DPT Br. 12).

This is hindsight reasoning by defendants, properly condemned by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The evidence overwhelmingly shows that conceptually the whole art, including the parties here, were hamstrung into thinking that softness was the way to go. Bylund alone went to super hard tempers.

More specifically, the Reynolds' Can Division itself thought you had to go soft. When metal didn't work they sent it back to McCook to anneal it (Tr. 137–39). After annealing, the metal worked, which taught the Reynolds Can Division to go soft. National, in early 1968, thought "0" temper was "ideal" (PRM 2996). Alcoa was taking H19 temper metal and annealing to "0" temper for Coors. When Alcoa began experimenting it went to high strength alloys in "0" temper (PRM 2533). Earlier, Kaiser was in soft tempers. Truly there was a conceptual problem in going to harder tempers. Alcoa heralded H19 as a great advancement (PRM 2011) and filed for a patent on using H19 temper metal without any thermal treatment during drawing and ironing (PRM 2013).

Defendants also cite (DPT Br. 8) two patents as "anticipations", Massingill No. 3,509,752 and Sandor No. 3,345,159. Under the law of the Seventh Circuit, these references do not disclose all of the elements of the claimed inventions, see, e.g., *Illinois Tool Works, Inc. v. CCC, Inc.*, 397 F.2d 517, 518 (7th Cir. 1968).

### 10. The Massingill Patent

Massingill is an unconventional drawing operation involving telescopic punches, heat, vibrations, uninterrupted continuous movement of metal, and was rejected by the Patent Office. Everyone rejected it for cans. Alcoa had a copy of the application in 1964. It certainly did not teach Alcoa to stop annealing the coils it was supplying to Coors in 1966 and 1967.

### 11. The Sandor Patent

This patent, owned by Reynolds, relates to high strength alloys which are stress relieved, two significant differences compared to Bylund's inventions. The Sandor patent did not teach Reynolds to go to H19 temper material.

The documents, insofar as they are internal company memos which are not put into practice, are not anticipations, *Bolkcom v. Carborundum Co.,* 523 F.2d 492, 499 (6th Cir. 1975), cert. den. 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976). Both the work at ACC and at Metal Flo was considered confidential (PRM 2536 [ACC] and Gardner Dep. Tr. 95–96 [Metal Flo]). As stated in *Worthington v. Southern New Jersey Newspapers, Inc.,* 323 F.Supp. 443, 464 (D.N.J.1970), "the knowledge relied upon must be accessible to the public." In *Worthington,* as here, reliance was placed on drawings and the like in company files and some experimental work not accessible to the public. Also, in *Worthington,* as here, reliance was placed on deposition testimony which failed to show exactly what was built, under what circumstances, and the accessibility to it.

Defendants have also alleged certain activities of Kaiser Aluminum as an anticipation of the Bylund patents (Findings DF94–100). They are not. Kaiser first became involved in drawing and ironing cans in the late 1950's, later abandoning all work as of about 1960. In fact, Mr. Reynolds testified that when Kaiser closed down its operations, Kaiser called Reynolds, indicating they were closing down and had some talented people [Reynolds Dep. Tr. 27]. Kaiser said "the men are going to be out on the street and if you are going to be in the can business, here's a good opportunity to hire them" [Reynolds Dep. Tr. 27]. Reynolds then hired Mr. Maeder and Mr. McAlpin [Reynolds Dep. Tr. 27].

Kaiser's commercial activities in drawn and ironed cans never amounted to very much. Their only production of drawn and ironed cans was using 3003 in the dead soft temper [Meyer Dep. Tr. 42]. This only continued for something less than a year [Henrickson Dep. Tr. 26–28]. There is some evidence that Kaiser made *drawn* cans in tempers up to H18, but the drawing operation in forming those cans did not involve any ironing or additional cold reduction [Meyer Dep. Tr. 41]. The material for the drawn cans, furthermore, was coated prior to forming, with the coating operation involving a heating operation. (Coating is an annealing operation which improves the formability of the sheet (PRM 2525, 2970, 2971). The drawn cans Kaiser furnished Mallory Air Force Base were formed from coated sheet [Henrickson Dep. Tr. 38–39].

Kaiser did, back in the late 1950's and up into 1960, have a desire to go to the use of higher tempers than "0" in the drawing and ironing of cans, and conducted some experimental work. This experimental work involved a differential annealing operation on the can circles that were to be drawn and ironed. In this, the outer edges of the circular blank were heat treated to soften the metal that would end up being ironed to make the sidewall [Meyer Dep. Tr. 46; Henrickson Dep. Tr. 57; PRM 3166]. Thus the differential annealing work reflects the conventional thinking in the art that "softer is better".

Kaiser did a technical study during the first half of 1966 as to how it might be possible to make a lighter weight drawn and ironed can. The Kaiser conclusion was to use high strength, high magnesium alloys in the "0" temper, or at most H32 temper [PRM 3160]. Thus Kaiser's solution to making a light weight can was the very same wrong road chosen by Alcoa when it considered the question in 1966.

Kaiser did not find out that H19 material could be drawn and ironed into can bodies without any intermediate anneals until the fall of 1967 [PRM 3158]. This was after Reynolds' activities were made known to Kaiser through Coors. [PRM 3161].

Although Kaiser did not itself go back into the aluminum D and I can business until November, 1968 [PRM 3165; Henrickson Dep. Tr. 32–33], Kaiser had been previously supplying D and I can sheet to others, including Coors. As of 1964 Kaiser's recommendations to National Can as to the best method of making beer cans was the use of 3004 in "0" temper or 3003 in "0" temper in a draw and iron operation [PRM 3164]. Even as late as January, 1969, Kaiser was using 3004–H32 for draw and iron, with work regarding H19 said to be in the

experimental stage [PRM 3014]. It will be recalled that Mr. Maeder, who had worked for Kaiser in its initial draw and iron program, had been the one to choose H32 temper. Mr. Maeder had later indicated to Mr. Larson at Reynolds that H32 had been chosen because Mr. Maeder felt that was as hard as you could go [Tr. 129]. Later, after Bylund's work, Mr. Maeder, of course, found out differently, and freely wrote in 1974 that the breakthrough of drawing and ironing H19 metal without anneals or thermal treatments was a Reynolds' accomplishment [PRM 2234].

Defendants have also urged that "there is no significant difference between H18 and H19 for purposes of draw and iron fabrication". That is not correct. As Mr. Bylund testified, in making H18 at can stock gages you would have an anneal part way through the cold rolling [Tr. 707], which is not true for H19. Also, at the H18 gage you're at a point where the metal structure has not yet changed into that which is characteristic of the high cold work region above 75%. Above 75% reduction the metal structure is fragmented, and all these particles influence the behavior of the metal [Tr. 707]. There are thus significant differences between H18 and H19 for drawing and ironing. Further, Mr. Nielsen testified that in making aluminum sheet to can stock gage in H18 temper, you would cold roll part way, then anneal, and finish the cold rolling to 75% [Tr. 2061–2062]. This is an expensive process [PRM 2298]. Further, it would not be consistent with the *concept* of H19, which Mr. Nielsen indicated to be doing *all* the cold rolling, from hot line gage to finish gage, without any anneals or thermal treatments [Tr. 1609–1610].

### IV.

There has been much talk of fraud in this case. (Alcoa has taken a "softer" approach than National on this subject.) Patent cases including charges that a patent was procured through fraud are not new to this Circuit and as the Seventh Circuit noted in *Armour & Co. v. Wilson & Co.*, 274 F.2d 143, 148 (7th Cir. 1960):

"It is easy to make charges of fraud, but the law rightfully insists that before legal rights may be based upon such charges, they must be established by *clear and convincing evidence*." (my emphasis)

See also *U. S. v. American Bell Telephone Co.*, 167 U.S. 224, 251, 17 S.Ct. 809, 42 L.Ed. 144 (1897); *Scott Paper Co. v. Fort Howard Paper Co.*, 432 F.2d 1198, 1204 (7th Cir. 1970), *cert. den.* 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971).

The burden of proving fraud by clear and convincing evidence is similarly the law of other circuits. *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 169 USPQ 625 (2d Cir. 1971); *Barr Rubber Products Co. v. Sun Rubber Co.*, 425 F.2d 1114, 165 USPQ 429 (2d Cir. 1970); *Xerox Corp. v. Dennison Mfg. Co.*, 322 F.Supp. 963, 168 USPQ 700 (S.D.N.Y.1971); *In Re Multidistrict Litigation Involving Frost Patent*, 540 F.2d 601, 191 USPQ 241 (3d Cir. 1976); *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 195 USPQ 402, 406 (6th Cir. 1977); *The National Rolled Thread Die Co. v. E. W. Ferry Screw Products, Inc.*, 541 F.2d 593, 192 USPQ 358, 363 (6th Cir. 1976); and *Pfizer, Inc., v. International Rectifier Corp.*, 538 F.2d 180, 190 USPQ 273, 278–279 (8th Cir. 1976).

The law clearly requires that the alleged fraudulent acts must have been carried out knowingly and willfully with an intent to deceive that the information was not known to the patent examiner, and that the information concealed was material to the prosecution of the patent application, *Columbia Broadcasting System, Inc. v. Zenith Radio Corp.*, 391 F.Supp. 780, 791 (N.D.Ill.E.D. 1975). Accord, *Pfizer v. IRC, supra; Parker v. Motorola,* 524 F.2d 518, 535 (5th Cir. 1975).

Defendants argue, in effect, that there is an absolute duty to disclose matters that Mr. Bylund and his attorney, Mr. Palmer, were not even aware of because defendants argue these matters may be relevant. Such is not the law, as noted in *Pfizer v. IRC, supra*, at 186, because this would:

"imposes an unworkable standard of conduct upon the patent applicant and ex-

pands the inequitable conduct defense beyond legitimate limits."

Citing from Judge Mansfield's decision in *Xerox Corp. v. Dennison Mfg. Co.*, 322 F.Supp. 963, 968 (S.D.N.Y.1971), the court in *Pfizer* saw there were good reasons for rejecting such a broad standard:

"To deny enforcement as a matter of law merely because of an innocent or good faith non-disclosure would go beyond what is necessary to protect the public against the improvident granting of a monopoly. Such a standard could also have the harmful effect of forcing a patent solicitor to flood the Patent Office in each case with a mass of data of doubtful materiality rather than take the risk that an inventor might later be denied the fruits of his monopoly because of failure to reveal some fact later magnified out of proportion by an infringer seeking to escape the reach of the patent by combing the inventor's files under our liberal pretrial discovery procedures and dredging up new found 'facts'."

This Circuit through Judge, now Mr. Justice, Stevens has determined that is is permissible to exercise one's judgment in the citation of art especially where there was an improbability the art in question would effect the Examiner's evaluation of the pending application, *CTS Corp. v. Piher International Corp.*, 527 F.2d 95, 99–100 (7th Cir. 1975). See also, *Wen Prod. Inc. v. Portable Elec. Tools, Inc.*, 367 F.2d 764, 767 (7th Cir. 1966), where it held that there was no unclean hands on the part of the patentee for a failure to disclose a prior art patent that did not embody the inventions defined by the claims in suit. Accord, *Feed Service Corp. v. Kent Feeds, Inc.*, 528 F.2d 756, 762–763 (7th Cir. 1976).

The duty to disclose was considered in *Illinois Tool Works, Inc. v. Solo Cup Co.*, 179 USPQ 322, 370–371 (D.C.N.D.Ill.E.D.1973) where the question involved inoperable, unacceptable prior articles. In reaching the conclusion there was no duty to disclose such items, even if knowledge of them was available, the court considered the items were not prior art since they were discarded as unacceptable.

There is also no duty to disclose to the Patent Office any prior use to which there is a bona fide basis for believing the use was experimental, *Clark Equip. Co. v. Keller*, 197 USPQ 83, 122 (D.N.D.1976), aff'd 570 F.2d 778, 197 USPQ 209, 218 (8th Cir. 1978). Likewise, there is no duty to disclose to the Patent Office non-anticipatory prior art, *Scott Paper v. Fort Howard Paper*, 432 F.2d 1198, 1204, 1205, 167 USPQ 4, 9, 10 (7th Cir. 1970); *Duff-Norton Co. v. Ratcliff*, 362 F.2d 551, 553, 150 USPQ 166 (9th Cir. 1966); *Clark Equip. Co. v. Keller, supra.*

Defendants argue (DPT Br. p. 29) that the following "highly relevant" information was "known" to Reynolds and was not disclosed to the Patent Office:

(a) the internal MRD letter (DA 2614);

(b) the Metal Flo meeting (DA 228); and

(c) the Sandor patent (DA 2609).

Items (a) and (b) were not known to either Bylund or Palmer, his attorney (Tr. 681, 683, 897, 904, 1086 & 1321; Palmer Dep. Tr. 179, 181, 183 & 259). Item (c) was, of course, known to both but clearly not even considered relevant because it involved a thermal treatment of 380–385°F for 8 hours (DA 2609, Col. 2, lines 39–40). Further, the Sandor alloy, as Mr. Larson testified, was considered a failure (TR. 223).

As stated in *Schnadig Corp. v. Gaines Mfg. Co.*, 494 F.2d 383, 393 (6th Cir. 1974):

"The evaluation of prior art as it bears on the patentability of an invention is a matter of good faith judgment. As long as the patent applicant fulfills his 'uncompromising duty' of good faith and conducts the prosecution with utmost candor, making a frank and truthful disclosure, he is not required to 'list out the full spectrum of his knowledge to establish [his] bona fides.' *Eli Lilly & Co., Inc. v. Generix Drug Sales, Inc.*, 460 F.2d 1096, 1102–1103 (5th Cir. 1972)."

Here Mr. Palmer testified as follows (Palmer Dep. Tr. 258):

"BY MR. BLENKO:

Q Mr. Palmer, returning to your activities while you were with Reynolds, did you recognize that in dealing with the Patent Office, an attorney has an uncompromising duty of candor and good faith toward the Patent Office?

A Yes. Since that has become the accepted standard, yes.

Q And you followed it at all times that you were with Reynolds?

A I tried to."

As to Metal Flo, Mr. Palmer testified (Palmer Dep. Tr. 179, 181, 183 & 259):

"Q Mr. Palmer, I am going to hand you the document that has just been marked as Exhibit DA228-A and ask you whether you have ever seen I that document before?

A I don't recall that I have ever seen this before, no.

Q Is it fair to say that your knowledge with respect to Metal Flo was limited to that which was set forth in the Massingill patent cited as a reference during the prosecution?

A As far as I can recall, that is the case.

Q Were you aware of any relationship of any kind between Reynolds Metals Company and Metal Flo Corporation in the period prior to August 8, 1966?

A I don't know whether I was aware of any or not. I don't recall any at the moment.

Q You have no knowledge of any?

A No.

Q Do you recall any discussion or statement to you regarding a visit by Reynolds personnel to Metal Flo near Jackson, Michigan in August of 1965?

A I believe the first time I became aware of that type of subject matter was after this suit was filed."

A marked up copy of the Massingill patent was found in Mr. McBride's files of Alcoa (PRM 2392). On this document (page 2) there appears the notation " 'O' temper tensile and yield strength greater than H19 value" (McBride Dep. Tr. 687), contrasting Example 4 involving "O" temper and Example 6 involving "H19" temper of Massingill. Thus, it is quite reasonable to conclude that Massingill does in fact involve some annealing when the "O" temper properties exceed those of "H19". Further, Alcoa's files contained a comparison of H19 draw and iron properties with those in Massingill. The difference in properties using H19 properties is truly striking: The D&I side wall was 45.3 ksi whereas the Massingill side wall was 30 ksi. In other words, the D&I H19 can had over 50 percent higher properties than the Massingill container (PRM 2024). This also suggests annealing.

All Mr. Palmer did was to suggest to the Patent Examiner that some anneal occurred. The Patent Examiner was free to, and did, evaluate the Massingill patent to his own satisfaction. Here, as in *Mueller Brass Co. v. Reading Ind., Inc.*, 352 F.Supp. 1357 (E.D.Pa.1972), we have merely "an argument put forth for the evaluation of the expert examiner, not a fraudulent statement of fact" and "the exhibits were there for the examiner's independent scrutiny" 352 F.Supp. at 1380.

Defendants have failed to show that Reynolds intended to deceive the Patent Office as to any information or that it purposefully withheld any material information from the Patent Office. The Patent Office did consider the Massingill patent which is the Metal Flo process. Under such circumstances, the presumption of validity over Massingill and the Metal Flo process is enhanced, *University of Illinois Foundation v. Block Drug Co.*, 241 F.2d 6, 112 USPQ 204 (7th Cir. 1957); and *Lewyt Corp. v. Health-Mor, Inc.*, 181 F.2d 855, 857 (7th Cir. 1950).

Defendants argue they are entitled to attorney fees based on their allegations of fraud. Defendants' failure to prove any fraud is also fatal to their argument for attorney fees. Under 35 U.S.C. § 285, defendants must show that this case is "exceptional", that is, there is some wrongdo-

ing or fraud. As the Seventh Circuit Court recently stated in *H. K. Porter Co. v. Black & Decker Mfg. Co.*, 518 F.2d 1177, 1178, 1179 (7th Cir. 1975):

"However, such attorneys' fees are only awarded in our Circuit in exceptional cases 'to prevent gross injustice and where fraud and wrongdoing are clearly proved.' *Technograph Printed Circuits Ltd. v. Methode Electronics, Inc.*, 484 F.2d 905, 909 (7th Cir. 1973)."

Accord, *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 685 (7th Cir. 1977).

Further, defendants have not shown that Reynolds believed its patents invalid to support an award of attorney fees, see *Indiana Gen'l Corp. v. Krystinel Corp.*, 421 F.2d 1023 (2d Cir. 1970). To the contrary, the testimony shows that Reynolds believed its patents valid and that there were no inaccuracies in the representations made to the Patent Office (Reynolds Dep. Tr. 73 & Glenn Dep. Tr. 118), and still do. Mr. Reynolds testified (Reynolds Dep. Tr. 73):

"Q  Why did you bring suit against Alcoa if you know?

A  I suppose and I know that we think we have a valid patent and we have paid Alcoa for many patents that they have without a suit on any thing. We think we have got a valid patent and that's why we brought suit.

.    .    .    .    .

A  As I recall we went to outside counsel as well as our own and everything, they came to me and said this, we think we have a valid patent and we should sue and that is roughly all I can remember  .   .   ."

### V.

Only National specifically pled an antitrust claim under Section 2 of the Sherman Act. Any claim under that section and *Walker Process Equip. v. Food Mach. Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), must, include proof of:

1.  A knowing, willful and intentional act of misrepresentation to the Patent Office, including omissions.

2.  The misrepresentation must be material so that the patent would not have issued but for the misrepresentation.

3.  The misrepresentation must be such that the Patent Office relied on it and this reliance must be reasonable and without error.

4.  The patent holder must have practiced the fraud or attempted to enforce the patent monopoly.

5.  The patent holder must be shown to have monopolized, or attempted to monopolize trade or commerce among the several states, 15 U.S.C. 2.

As stated in *Walker Process, supra* :

"To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure Food Machinery's ability to lessen or destroy competition. It may be that the device—knee-action swing diffusers—use in sewage treatment systems does not comprise a relevant market. There may be effective substitutes for the device which do not infringe the patent. This is a matter of proof, as is the amount of damages suffered by Walker." (382 U.S. at 177–178, 86 S.Ct. at 350–351).

National has failed to prove any of elements 1 to 4 above, as shown supra. The Patent Office independently considered the Massingill patent and the Metal Flo process. There was no obligation to disclose experimental work or failures, even if Bylund and Palmer knew of them. This result is just because such information would not bar a patent. The antitrust claim fails in its inception, see e. g., *Forbro Design Corp. v. Raytheon Co.*, 390 F.Supp. 794, 190 USPQ 70 (D.Mass.1975), aff'd 532 F.2d 758 (1st Cir. 1976).

As for item 5, National has failed to show either the relevant market or the "exclusionary power" in the market required under *Walker*. As recently stated in *Tape-*

*switch Corp. v. Recora Co.,* 196 USPQ 348, 351 (N.D.Ill.1977), the other elements of a Section 2 case include:

". . . The definition of the relevant market is a necessary element in the proof of a monopolization claim. *United States v. Grinnell Corp.,* 384 U.S. 563 [86 S.Ct. 1698, 16 L.Ed.2d 778] (1966), as well as an attempted monopolization claim. *Tire Sales Corporation v. Cities Service Oil Company,* 410 F.Supp. 1222 (N.D.Ill. 1976). One aspect of the relevant market which must be made out is the product market. The classic definition of a product market is found in the case of *United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377 [76 S.Ct. 994, 100 L.Ed. 1264] (1956). There the Court stated that

"In considering what is the relevant market for determining control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." 351 U.S. at 395 [76 S.Ct. 994]

Finding that *Recora* had failed to define the size of the relevant market or show plaintiff's share therein, the Court held that the Section 2 claim failed, as a matter of law.

The same situation exists in this suit. National has presented no evidence showing what constitutes the relevant market from the standpoint of the commodities or individuals involved. Nor has National shown the shares and shareholders in this undefined market.

Alcoa is admittedly the largest producer of H19 aluminum D&I can stock sheet and National is the largest producer of cans (PRM 2011B). National has not presented any evidence in this litigation that would even permit an appraisal of Reynolds ability to obtain some type of monopoly control in view of the dominance of the defendants. *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* 452 F.2d 579, 598 (7th Cir. 1971). In *Kearney* the parties stipulated the relevant market, 452 F.2d at 597. Na-

tional has also not presented any evidence of intent to exclude competition.

National alleges that it has no viable alternative but to infringe the patent. However, National also claims to employ only the Massingill approach and the Metal Flo process. Were that so, National has an alternative approach from that defined by the patents in suit. Reynolds makes no claim to the Metal Flo process using telescopic punches, vibrations, and retained heat. National, however, does not use that process.

However, the record shows that defendants copied the Reynolds inventions rather than pursuing a path of their own. Accordingly, it cannot be said that requesting a reasonable royalty for defendants' use of Reynolds' inventions is other than lawful and reasonable. Further, as shown infra, Reynolds does not request an injunction against either National or Alcoa. Clearly, Reynolds has no intent to exclude lawful competition. Mr. Reynolds testified to just the opposite. (Reynolds Dept. Tr. p. 59). Likewise, in appraising the character of Reynolds' activity, it cannot be said to have been wrongful nor characterized as predatory.

There also is no evidence which establishes Reynolds' capacity to monopolize some yet undefined market, an intent to acquire the power to exclude competition from a significant share of that elusive market, nor the use of predatory means therefor.

Lastly, National has failed to show an injury. As stated in *Kearney v. Giddings, Inc.,* 452 F.2d at 599:

". . . to recover damages [defendant] must also demonstrate that plaintiff's conduct 'injured [him] in his business or property.' 15 U.S.C. § 15"

National offered no evidence or testimony showing that their business or property has been injured in any way as a result of this litigation. In short, National has not met the burden of proof, which is upon them, as to any antitrust claim.

## VI.

On the basis of the foregoing, the Court reaches the following conclusions:

1. In every patent case there is a presumption the patent in suit is valid. The burden of establishing invalidity rests on the defendant. 35 U.S.C.A. § 282. *Helms Products v. Lake Shore Mfg. Co.,* 227 F.2d 677, 680 (7th Cir. 1955); *Copease Mfg. Co. v. American Photocopy Equipment Co.,* 298 F.2d 772, 777 (7th Cir. 1961).

■ 2. When the prior art put forward by defendants has already been considered and rejected by the Patent Office, the presumption of patent validity is entitled to greater weight. The burden of overcoming this presumption rests heavily on defendants and they have failed to provide a clear and cogent showing of invalidity. *Reese v. Elkhart Welding & Boiler Works, Inc.,* 447 F.2d 517, 526 (7th Cir. 1971); *Illinois Tool Works, Inc. v. CCC, Inc.,* 397 F.2d 517, 519 (7th Cir. 1968).

3. The 1952 Patent Act, 35 U.S.C. §§ 1–293, sets out the conditions of patentability in three sections indicating that patentability is dependent upon three explicit conditions: novelty and utility as articulated and defined in section 101 and section 102, and non-obviousness, the statutory formulation as set out in section 103. *Graham v. John Deere Co.,* 383 U.S. 1, 12, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

4. The claims of the '972 and '590 patents in suit are clear, understandable, unambiguous, and properly measure the inventions in suit within the requirements of 35 U.S.C. § 112.

■ 5. The evidence shows that notwithstanding the great need for a lightweight aluminum can and the effort expended toward that end, the facts show that others in the aluminum industry did not recognize that lighter weight hard aluminum sheet could be cold rolled and then drawn and ironed into can bodies without the need of any heat treatments. Accordingly, the presumption of validity of the patents in suit is strengthened by the unsuccessful efforts of others laboring in the same field. *Ekco Products Co. v. Chicago Metallic Mfg. Co.,* 321 F.2d 550, 554 (7th Cir. 1963).

6. The patents in suit were regularly and properly issued by the United States Patent Office, and the issuance of a patent is enough to show, until the contrary appears, that all conditions under which an invention is patentable, in accordance with the statutes, have been met. *Mumm v. Jacob E. Decker & Sons,* 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937).

■ 7. Defendants have failed to discharge their burden of proof overcoming the presumption of validity of the patents. Defendants have not furnished the Court with evidence which would cause the patent to be held invalid under any statutory provision. Hence, the patents are valid and enforceable.

■ 8. Prior discoveries that have not been fully understood or which unwittingly produced a result that was not sought will not serve to anticipate later inventions. *Tilghman v. Proctor et al.,* 102 U.S. 707, 26 L.Ed. 279 (1881).

■ 9. Alleged prior art which fails to achieve its intended result will not be considered an anticipation of a subsequently proven intention. *United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). Likewise, an invention or discovery that is incomplete or not capable of producing the result sought to be accomplished, here the commercial production of lightweight, strong aluminum cans, that earlier invention cannot be availed of to defeat a patent founded on a complete and practical invention. *Coffin v. Ogden,* 85 U.S. (18 Wall) 120, 21 L.Ed. 821 (1874).

10. The Metal Flo process and cans made thereby are not an anticipation of the Bylund patents here in suit because that process has never been fully understood, was only an incomplete experiment that was later abandoned to the extent that it related to beverage can manufacture. *Coffin v. Ogden,* 85 U.S. 120, *supra; United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708,

supra; *Lyon v. Bausch & Lomb Optical Co.,* 224 F.2d 530, 534 (2d Cir. 1955), *cert. den.* 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955); *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.,* 436 F.2d 1180 (7th Cir. 1971); *Dart Industries, Inc. v. E. I. duPont de Nemours,* 348 F.Supp. 1338 (D.C.N.D.Ill. E.D.1972); *W. R. Grace & Co. v. Park Mfg. Co. et al.,* 378 F.Supp. 976 (D.C.Ill.E.D. 1974).

11. Under Section 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained, and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. *Graham v. John Deere,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). See also *The Allen Group, Inc. v. Nu-Star, Inc.,* 575 F.2d 146 (No. 77–1840 7th Cir. April 28, 1978).

12. Since the "level of ordinary skill" in a particular art is not usually defined in writing, the usual way of determining that level is to refer to the subjective reaction of a person thoroughly familiar with the particular art and, if possible one who practiced the art at the crucial time in question. *Malsbary Mfg. Co. v. Ald, Inc.,* 447 F.2d 809, 171 USPQ 7 (7th Cir. 1971).

13. It is clear from the facts that extensive efforts and many investigations were made in the early 60's to obtain a light weight aluminum can. The aluminum industry had both the means and facilities at its disposal to solve that problem and the fact it was not sooner found and used lends credence to the conclusion the invention protected by the patents in suit was not obvious. *Carnegie Steel Co. v. Cambria Iron Co.,* 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968 (1902); *Pyle Nat. Co. et al. v. Lewin,* 92 F.2d 628 (7th Cir. 1937); *National Dairy Products Corp. v. Borden Co.,* 394 F.2d 887, 890 (7th Cir. 1968); *Schnell v. Allbright-Nell Co.,* 348 F.2d 444 (7th Cir. 1965); *Shumaker v. Gem Mfg. Co.,* 311 F.2d 273 (7th Cir. 1962); *AMP Incorporated v. Vaco Products Co.,* 280 F.2d 518 (7th Cir. 1960).

14. When making the inquiries required by *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, supra, the purpose of reconstructing the true circumstances existing at the time the invention was made must be kept in mind. Hindsight has no place and is of no value in this inquiry as to what would have been obvious at that time. *Diamond Rubber Co. v. Consolidated Rubber Tire Co.,* 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527 (1911); *Walt Disney Productions v. Fred A. Niles Communications Center, Inc.,* 369 F.2d 230, 234 (7th Cir. 1966); *Zegers v. Zegers, Inc.,* 365 F.2d 156 (7th Cir. 1966); *Simplicity Mfg. Co. v. Quick Mfg. Inc.,* 355 F.2d 1012 (6th Cir. 1966); *AMP Incorporated v. Vaco Products Co.,* 280 F.2d 518 (7th Cir. 1960).

■ 15. The fact that no one with ordinary skill in the art testified at trial that the inventions defined by the claims of the patents in suit were obvious at the time they were invented buttresses the conclusion that this invention was not obvious. *National Dairy Products Corp. v. Borden Co.,* 394 F.2d 887, 890, 157 USPQ 227, 229–230 (7th Cir. 1968).

■ 16. Secondary considerations such as commercial success, long-felt but unsolved needs, failure of others, etc. may be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or non-obviousness, these inquiries may have relevance. *Graham v. John Deere,* 383 U.S. 1, 17, 18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

17. The conclusion of non-obviousness is buttressed by the evidence relative to the secondary tests to be considered as set forth in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, and repeated in *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d 66 (3d Cir. 1972), *cert. den.* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). These tests include commercial success of the aluminum industry with draw and iron cans, filling a long-felt need of making a lightweight aluminum can to compete with tin free steel cans, *failure of others to develop the invention, including*

the defendants and copying by others also including the defendants. See comments of Honorable William C. Conner, American Patent Law Association Bulletin, Oct.-Nov. 1977, pp. 618–627. The fact that no one prior to Bylund had discovered the inventions defined by the patents in suit, in spite of a need is evidence of non-obviousness. *LaSalle Street Press v. McCormick & Henderson*, 445 F.2d 84, 93 (7th Cir. 1971).

18. The Massingill patent discloses even more than the Metal Flo experimental beverage can program, which was abandoned, and the latter program would have had no impact whatsoever on the issuance of the Bylund patents, since the Massingill patent was considered by the Patent Office which determined the Bylund patents were neither anticipated nor rendered obvious thereby. *Clark Equip. Co. v. Keller*, 570 F.2d 778, 197 USPQ 209, 218 (8th Cir. 1978); *Tate Eng. Inc. v. United States*, 477 F.2d 1336, 1345, 201 Ct.Cl. 711, 175 USPQ 115, 121–22 (1973).

19. The facts show that work prior to the patents in suit did not practice the claimed inventions, even unwittingly and indicates the inventions here in suit were not obvious. *Tilghman v. Proctor*, 102 U.S. 707, 26 L.Ed. 279 (1881); *National Dairy Products Corp. v. Borden Company*, 394 F.2d 887, 890 (7th Cir. 1968).

20. Alcoa's statements in its advertising and in the Dunn patent application are of significant evidentiary value in determining the contemporaneous thinking of those skilled in the art and tend to confirm that the Bylund inventions defined in the claims of the patents in suit were not obvious. *Tracor, Inc. v. Hewlett-Packard Co.*, 519 F.2d 1288, 1307 (7th Cir. 1975).

■ 21. To be patentable, a combination of elements must produce something more than the sum of the preexisting elements; there must be a synergistic result that is itself non-obvious. *Anderson's Black Rock, Inc. v. Pavement Salvage Co., Inc.*, 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258, 163 USPQ 673, 674–675 (1969); *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532, 47 L.Ed.2d 784, 189 USPQ 449, 452, 453 (1976);

St. Regis Paper Co. v. Bemis Co., 549 F.2d 833 (7th Cir. 1977); University of Illinois Foundation v. Block Drug Co., 241 F.2d 6 (7th Cir. 1957).

■ 22. A novel combination of old elements which so cooperate as to produce a new and useful result or a substantial increase in efficiency is patentable. *Lewyt Corporation v. Health-Mor, Inc.*, 181 F.2d 855, 857, 85 USPQ 335, 336–340 (7th Cir. 1950); *Helms Products v. Lake Shore Mfg. Co.*, supra, 227 F.2d at 681, 107 USPQ at 315–316; *Weller Mfg. Co. v. Wen Products, Inc.*, 231 F.2d 795, 798, 109 USPQ 73, 74–75 (7th Cir. 1956); *Mojonnier Dawson Co. v. United States Dairies Sales Corp.*, 251 F.2d 345, 116 USPQ 106 (7th Cir. 1958); *Copease Mfg. Co. v. American Photocopy Equipment Co.*, 298 F.2d 772, 132 USPQ 87 (7th Cir. 1961).

23. The inventions defined in the claims of the Bylund patents in suit produce a new and useful result, to-wit: the ability to draw and iron can bodies from highly cold worked aluminum alloy sheet that has not been annealed or stress relieved without causing cracks in the metal during drawing and ironing together with increased tool life and are patentable. *Anderson's Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258, 163 USPQ 673, 674–675 (1969); *Sakraida v. Ag Pro Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532, 47 L.Ed.2d 784, 189 USPQ 449, 452–453 (1976).

24. The inventions defined in the claims of Bylund patents in suit produce an unexpected result, to-wit: that the highly cold worked aluminum can stock material was easier to draw and iron than the soft material that had received heat treatments and, accordingly, comprise a patentable invention. *Trio Process Corporation v. L. Goldstein's Sons, Inc.*, 461 F.2d 66 (3d Cir. 1972); *Anderson's Black Rock, Inc., v. Pavement Salvage Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258, 163 USPQ 673, 674–675 (1969); *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784, 189 USPQ 449, 452–453 (1976).

25. The claims of the patents in suit defined patentable, and unobvious inventions in that they accomplished a result which the prior art and defendants themselves said could not be done. *Trio Process Corporation v. L. Goldstein's Sons, Inc.,* 461 F.2d 66, 71 (3d Cir. 1972).

26. A person of ordinary skill in the art knowing of and being fully aware of the separate elements of the Bylund concepts, would not have expected that it would be possible to combine them and be able to draw and iron a practical lightweight aluminum can from highly cold worked aluminum sheet without any anneals or heat treatments from the beginning of cold rolling to the conclusion of drawing and ironing. *E. T. Industries, Inc. v. Whittaker Corp.,* 523 F.2d 636, 641 (7th Cir. 1975).

27. The inventions defined in the claims of the Bylund patents in suit produce a new, useful and unexpected result, to-wit: the ability to draw and iron can bodies from highly cold worked aluminum can stock without the necessity of employing special anneals, heat treatments or stress relieving from cold rolling through the conclusion of the drawing and ironing process and are patentable. *Trio Process Corporation v. L. Goldstein's Sons, Inc.,* 461 F.2d 66, 71 (3d Cir. 1972); *Anderson's Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258, 163 USPQ 673, 674–675 (1969); *Sakraida v. Ag Pro Inc.,* 425 U.S. 273, 282, 96 S.Ct. 1532, 47 L.Ed.2d 784, 189 USPQ 449, 452–453 (1976).

28. The "guiding star" in construction of a patent is the phraseology employed in the claims. *Super Products Corp. v. D.P. Way Corp.,* 546 F.2d 748, 756 (7th Cir. 1976); *Texas Co. v. Globe Oil & Refining Co.,* 225 F.2d 725, 729 (7th Cir. 1955). And it is the claims that measure the invention. *Laser Alignment, Inc. v. Woodruff & Sons,* 491 F.2d 866, 872 (7th Cir. 1974), *cert. den.* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Aro Manufacturing Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 339, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961).

29. Claims 1–10 of the '972 patent were in all material respects present as claims in the August 11, 1967 patent application. Claims 1–10 are not limited to any particular aluminum alloy except ones that have a low work-hardening rate (or low work-hardening rate above 75 percent reduction) and sufficient ductility at high cold work levels to permit cold working to the extent of at least 90 percent without the necessity of annealing or stress relieving the metal. The evidence establishes that these criteria define a wide variety of alloys, including the 3004–H19 draw and iron can stock manufactured and sold by Alcoa.

30. The phrase "low work-hardening rate" or "low work-hardening rate above 75 percent reduction" is adequately disclosed by the patents in suit in Figure 3 and Examples 11–17 to refer to alloys having work-hardening rates identical to that of the 3004–H19 draw and iron can stock manufactured and sold by Alcoa.

31. Claims 11–15 of the '972 patent are not limited to any particular aluminum alloy except those that have sufficient ductility at high cold work levels to permit cold working to the extent of at least 90 percent without the necessity of annealing or stress relieving the metal. The evidence establishes that 3004–H19 draw and iron stock as manufactured and sold by Alcoa meets this criteria.

32. The claims of the '972 and '590 patents are not to be read as limited to the Al-high Fe examples nor the Al-high Fe Mg and/or Mn examples in the patent specifications. The specific examples in the patents set forth the best mode contemplated by Bylund for practicing his invention as of the filing date of August 11, 1967, in compliance with 35 U.S.C. § 112. Section 112 only requires specific disclosure of the best mode, not all modes or embodiments of the invention, so that the claims, since they apply to all modes, are of necessity broader than the specific examples of the specification. *American Photocopy Equipment Co. v. Rovico, Inc.,* 257 F.Supp. 192 (N.D.Ill. 1966), aff'd 384 F.2d 813 (7th Cir. 1967). See also, *Eutectic Corp. v. Metco, Inc.,* 579 F.2d 1, 197 USPQ 129 (2d Cir. 1978).

33. As applied to a patent, infringement is the unauthorized making, using or selling for use or for profit of an invention covered by a valid claim of a patent during the life of the patent. 35 U.S.C. § 271.

■ 34. The infringement of a patent may consist of any one, two or all three of the acts of making, using or selling the patented invention without the authority of the patent owner. *Schiff v. Hammond Clock Co.*, 69 F.2d 742 (7th Cir. 1934).

■ 35. In determining whether an accused article or method infringes a valid patent, the accused article or method is to be compared to the language of the claims of the patent. If accused matter falls clearly within the claim, the claims are infringed. *Graver Tank Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1949). *CTS Corp. v. Piher International Corp.*, 527 F.2d 95, 100, 188 USPQ 419, 423 (7th Cir. 1975), cert. den. 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748, 189 USPQ 384 (1976); *S. S. Kresge Co. v. Davies*, 112 F.2d 708 (8th Cir. 1940).

■ 36. Defendant National Can's production of drawn and ironed cans is in accordance with Claims 1–15 of Bylund patent 3,691,972 and Claims 1, 2, and 5–13 of Bylund patent 3,814,590 and has been and is still being done without the authority of Reynolds. This activity constitutes a direct infringement of the asserted claims of the patents in suit. *Reese v. Elkhart Welding and Boiler Works, Inc.*, 447 F.2d 517, 528 (7th Cir. 1971).

■ 37. Whoever actively induces infringement of a patent shall be liable as an infringer. 35 U.S.C. § 271(b). Alcoa has actively induced infringement of Claims 1–15 of Bylund patent 3,691,972 and claims 1, 2 and 5–13 of Bylund patent 3,814,590 by purposefully causing, urging or encouraging others including National Can to infringe. *Honeywell, Inc. v. Metz Apparate-*

*werke*, 509 F.2d 1137, 184 USPQ 387 (7th Cir. 1975).

■ 38. Alcoa's aid and assistance to its D&I stock customers in solving customer problems associated with drawing and ironing has encouraged direct infringement of the patents in suit and renders Alcoa liable as an infringer.

■ 39. In assessing whether a product is a staple article of commerce, the quality, quantity and efficiency of the suggested alternate uses are to be considered. *United States Gypsum Co. v. National Gypsum Co.*, 440 F.2d 510 (7th Cir. 1971); *Rohm & Haas Co. v. Owens-Corning Fiberglas Corp.*, 196 USPQ 726, 745 (N.D.Ala.1977).

■ 40. Alcoa's aluminum sheet can stock is made, advertised and sold specifically and expressly as draw and iron can stock. Any diversions by Alcoa of its D&I can stock have occurred only occasionally, have included defective material, and the amounts have been insignificant in comparison with the quantities used for D&I purposes. Accordingly, Alcoa's D&I can stock is not a staple article or commodity of commerce suitable for substantial non-infringing uses within the meaning of 35 U.S.C. § 271(c). *Arthur J. Schmitt Foundation v. Stockham Valves & Fittings, Inc.*, 292 F.Supp. 893, 906 (N.D.Ala.1966), aff'd 404 F.2d 13 (5th Cir. 1968), cert. den. 398 U.S. 965, 90 S.Ct. 2177, 26 L.Ed.2d 549 (1970).

■ 41. The alternate uses proposed by Alcoa for its D&I can stock are clearly less efficient than the end use for which it is particularly adapted, and proposed less efficient alternative uses are not sufficient to avoid liability as a contributing infringer under 35 U.S.C. § 271(c). *Johnson & Johnson v. W. L. Gore & Assoc., Inc.*, 436 F.Supp. 704 (D.Del.1977).

42. The lack of proof of a regular program of diversion at Alcoa for its H19 aluminum can sheet stock confirms there is only a mere possibility now of non-infring-

ing uses. This is apparently an afterthought and does not fulfill Alcoa's burden of showing actual and substantial use and does not prevent Alcoa's liability as a contributory infringer. *Fromberg, Inc. v. Thornhill et al.*, 315 F.2d 407 (5th Cir. 1963).

43. The nature and character of Alcoa's and National's acts of infringement have not been of the type associated with an innocent, good faith or accidental infringer and lead to the conclusion that both Alcoa and National are willful, intentional and deliberate infringers with a disregard of Reynolds' patent rights. *American Safety Table Co. v. Schreiber*, 415 F.2d 373 (2d Cir. 1969), *cert. den.* 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682 (1970); *Milgo Electronic Corp. v. United Telecommunications, Inc.*, (D.C.Kan.1978).

44. New matter is material of a substantive nature that has the effect of changing the invention. *Topliff v. Topliff*, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658 (1892).

45. The claims of the '590 patent here in suit carry forward concepts disclosed and claimed in the August 11, 1967 application and since they are supported by the disclosure in that application they do not constitute the addition of new matter. *Pursche v. Atlas Scraper & Eng. Co.*, 300 F.2d 467, 476–477 (9th Cir. 1961), *cert. den.* 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170 (1962); *Rel-Reeves Inc. v. United States*, 534 F.2d 274, 280, 209 Ct.Cl. 595 (1976). 35 U.S.C. §§ 112, 120, 132.

46. The fact that the Patent Office accepted the amended claims presented during prosecution of the Bylund '972 and '590 patents with no objection as to "new matter" is entitled to an especially weighty presumption of correctness, *Technicon Instruments v. Coleman Instruments*, 385 F.2d 391, 393 (7th Cir. 1967).

47. The claims which issued in the '590 patent in suit are supported by the disclosure of the August 11, 1967 application and are similar to but more limited than Claim

29 filed in the August 11, 1967 patent application. There is no late claiming in the '590 patent. 35 U.S.C. §§ 112, 120. *Illinois Tool Works, Inc. v. Continental Can Co.*, 397 F.2d 517 (7th Cir. 1968); *Technicon Instruments Corp. v. Coleman Instruments Corp.*, 385 F.2d 391 (7th Cir. 1967); *American Photocopy Equipment Co. v. Rovico, Inc.*, 384 F.2d 813 (7th Cir. 1967); *Aerosol Research Co. v. Scovill Mfg. Co.*, 334 F.2d 751 (7th Cir. 1964); *Helms Products, Inc. v. Lake Shore Mfg.*, 227 F.2d 677 (7th Cir. 1955); *American Anode, Inc. v. Lee-Tex Rubber Products Corp.*, 136 F.2d 581 (7th Cir. 1943).

48. New claims can be added to an application or in subsequently filed continuing applications where the new claims are supported by the disclosure in the original application, 35 U.S.C. §§ 112, 120; *Acme Highway Products Corp. v. D. S. Brown Co.*, 431 F.2d 1074 (6th Cir. 1970), *cert. den.* 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971); *Technicon Instruments Corp. v. Coleman Instruments Corp.*, 385 F.2d 391, 393–394 (7th Cir. 1967); *King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc.*, 354 F.2d 533 (10th Cir. 1965); *Coats Loaders and Stackers, Inc. v. Henderson et al.*, 233 F.2d 915 (6th Cir. 1956); 109 USPQ 332; *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F.Supp. 948 (S.D.Fla.1972), aff'd 479 F.2d 1328 (5th Cir. 1973).

49. The subject matter of Claims 11–15 of the '972 patent was adequately disclosed in the August 11, 1967 patent application as filed, and there was no late claiming with respect to these claims. *Binks Mfg. Co. v. Ransburg Electro-Coating Corp.*, 281 F.2d 252 (7th Cir. 1960); *Coats Loaders and Stackers, Inc. v. Henderson*, 233 F.2d 915 (6th Cir. 1956).

50. A comparison of the Metal Flo process and the patents in suit shows there are significant differences existing supporting Reynolds' position that the limited information possessed by Reynolds was neither anticipatory nor more relevant than other information before the Examiner thereby evi-

dencing the lack of materiality and any deceptive intent. Failing such a showing there can be no finding of fraud. *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 328 F.Supp. 1132 (D.C.W.D.Tex.1971).

51. Alcoa and National have not sustained their burden of proving Reynolds guilty of fraud or misconduct in their proceedings with the Patent Office during prosecution of the patents in suit. Such proof must be shown by clear, unequivocal and convincing evidence which is lacking in this case. *In re Multidistrict Litigation Involving Frost Patent*, 540 F.2d 601 (3d Cir. 1976), 191 USPQ 241; *U. S. v. American Bell Telephone Co.*, 167 U.S. 224, 251, 17 S.Ct. 809, 42 L.Ed. 144 (1897); *Schnadig Corp. v. Gaines Mfg. Co.*, 494 F.2d 383 (6th Cir. 1974).

52. The alleged misconduct of Reynolds must be accompanied by some element of materiality regarding the asserted basis for the misconduct as well as willfulness or bad faith. The standard is not one of liability for innocent or even negligent omissions, or misstatements before the Patent Office. Defendants have not established any element of Reynolds' willfulness or bad faith by clear and convincing evidence, *Super Products Corp. v. D.P. Way Co.*, 546 F.2d 748, 758 (7th Cir. 1976).

53. The standard of proof necessary for a finding of fraud is not one of liability for innocent or even negligent omissions, non-disclosures, or misstatements before the Patent Office. Rather, the alleged fraudulent misconduct "must be accompanied by some element of willfulness or bad faith, which must be established by clear, unequivocal and convincing evidence, *Super Prod. Co. v. D.P. Way Corp.*, 546 F.2d 748, 758 (7th Cir. 1976); *Airtex Corp. v. Shelley Radiant Ceiling Co.*, 536 F.2d 145, 155 (7th Cir. 1976); *Everest & Jennings, Inc. v. Colson Corp.*, 371 F.2d 240, 243 (7th Cir. 1967); *Pfizer, Inc. v. IRC*, 538 F.2d 180, 186 (8th Cir. 1976).

54. There is no duty to disclose to the Patent Office any prior use to which there is a bona fide basis for believing the use was experimental, *Clark Equip. Co. v. Keller*, 197 USPQ 83, 122 (D.N.D.1976), aff'd 570 F.2d 778, 197 USPQ 209, 218 (8th Cir. 1978). Likewise there is no duty to disclose to the Patent Office non-anticipatory prior art, *Scott Paper v. Fort Howard Paper*, 432 F.2d 1198, 1204, 1205, 167 USPQ 4, 9, 10 (7th Cir. 1970); *Duff-Norton v. Ratcliff*, 362 F.2d 551, 553, 150 USPQ 166 (9th Cir. 1966); *Clark Equip. Co. v. Keller*, 197 USPQ 83, 122 (D.N.D.1976), aff'd 570 F.2d 778, 197 USPQ 209, 218 (8th Cir. 1978).

55. A claim for attorney fees under 35 U.S.C. § 285 based on fraud on the Patent Office requires "clear and definite proof" that there was some wrongdoing or fraud. Since that requisite proof is lacking in this case, the defendants' claim for attorney fees is denied. *Super Prod. Corp. v. D.P. Way Co.*, 546 F.2d 748, 758 (7th Cir. 1976); *H. K. Porter v. Black & Decker Mfg. Co.*, 518 F.2d 1177, 1178–1179 (7th Cir. 1975); *Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc.*, 484 F.2d 905, 909 (7th Cir. 1973); *Sarkes Tarzian Inc. v. Philco Corp.*, 351 F.2d 557, 560 (7th Cir. 1965); *Armour & Co. v. Wilson & Co.*, 274 F.2d 143, 148 (7th Cir. 1960).

56. National has not shown that the Bylund patents were fraudulently obtained. Without such a showing the antitrust claim fails in its inception. Accordingly, as to National Can's § 2 Sherman Act counterclaim finding is made in favor of the plaintiff thereon. *Forbro Design Corp. v. Raytheon Co.*, 390 F.Supp. 794 (D.Mass. 1975), aff'd 532 F.2d 758 (1st Cir. 1976).

. [27] 57. An essential requirement to establish monopolization or an attempt to monopolize under § 2 of the Sherman Act is the definition of the relevant market for the product involved. National has provided no evidence by which it is possible to

appraise or define the relevant market, its size nor the shares and shareholders therein. National Can's failure to meet its burden of proof in this regard causes its § 2 claim to fail as a matter of law. *Walker Process Equipment v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Tapeswitch Corp. v. Recora Co.*, 196 USPQ 348 (N.D.Ill.1977).

58. An element essential in proving a valid § 2 Sherman Act claim is a showing of the alleged wrongdoers' ability to obtain monopoly control of the relevant market. While National Can has presented no evidence that would allow an appraisal of Reynolds' ability to gain monopoly control of a yet undefined market, National's size as to the largest producer of cans is impressive and confirms that the basis for the § 2 claim is deficient and must fail. *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1971).

59. The evidence and testimony shows that defendants have chosen to follow the path found by Reynolds rather than another path or one they themselves forged by their own efforts. The character of Reynolds' activity has not been wrongful nor predatory and National's § 2 claim lacks, therefore, any showing of intent, by Reynolds, of excluding competition. *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1971).

60. A necessary element in recovery of damages under a § 2 Sherman Act claim, the proponent thereof must demonstrate that the alleged monopolizer's conduct has injured him in his business or property. National has not met this burden of proof and has offered no evidence of injury resulting from this litigation. No basis exists for the recovery of any damages even if a violation of § 2 of the Sherman Act were found. *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1971).

61. Plaintiff's United States patents in suit numbers 3,691,972 and 3,814,590 are

valid within the meaning of Title 35 of the United States Code.

62. Plaintiff's United States patents in suit numbers 3,691,972 and 3,814,590 are enforceable within the meaning of Title 35 of the United States Code.

63. Plaintiff Reynolds is entitled to judgment, including damages to be assessed by the Court, from the date of the infringement in an amount no less than a reasonable royalty together with interest and costs as fixed by the Court, 35 U.S.C. § 284.

## VII.

## JUDGMENT

Judgment is hereby rendered in favor of plaintiff Reynolds as to validity, infringement and enforceability of United States Patent Nos. 3,691,972 and 3,814,590, and against defendants Alcoa and National. Judgment is hereby rendered in favor of plaintiff Reynolds and against defendants Alcoa and National as to all of defendants' counterclaims respecting said patents herein suit.

IT IS HEREBY ORDERED AND ADJUDGED that plaintiff Reynolds Metals Company is the prevailing party as to all issues, and, more specifically United States Patent Nos. 3,691,972 and 3,814,590 are valid and that Claims 1–15 of United States Patent No. 3,691,972 and Claims 1, 2 and 5–13 of United States Patent No. 3,814,590 are infringed by both defendants and defendant Alcoa has also contributorily infringed and induced National to infringe said patents.

Plaintiff Reynolds also prevails on all counterclaims tried in this case by defendants, and the Court now finds for the plaintiff and against defendants on said counterclaims.

It is further ordered and adjudged that the plaintiff recover its costs as against both defendants.

Appendix A to follow.

## APPENDIX A

514

CHRONOLOGY OF BYLUND INVENTIONS
& PATENT APPLICATIONS FILED IN
UNITED STATES PATENT OFFICE

**Filed January 16, 1968**
S.N. 712,314
Pat. No. 3,571,910
Issued March 23, 1971

Disclosure

Same as S.N. 660,132

Claims

Non-elected method claims
13-21 and 30-39 from S.N. 660,132

Division

Group I - Claims 13-21 to method of
alloying and shaping aluminum
material

Group II - Claims 30-39 to method (no
alloy limitations) including
cold rolling and forming
(dependent claims to D&I
specifically) without thermal
treatments

Elected Group I Claims 13-21 and argued
patentability without making any amendments

Claims 13-21 to method of alloying (0.6-2.5% Fe)
and cold rolling (dependent claims to drawing
and ironing without thermal treatment) allowed
and issued as claims in Pat. No. 3,971,910

**Filed July 9, 1970**
S.N. 889,790
Pat. No. 3,691,972
Issued Sept. 19, 1972

Disclosure

Same as S.N. 660,132 and 712,314

Claims

Non-elected broad method claims 30-39 (Group II) presented
as application Claims 1-10. New application Claims 11-15
also presented.
Pre-examination amendment added Claims 16-22 directed to
D&I can body made of aluminum alloy with Fe 0.75-2.5%.
Independent Claim 16 like Claim 26 of Patent 3,397,044
except that Claim 26 was broader, having no limitation on
the percentage of iron present.

Division

Group I - Claims 1-15 drawn to method

Group II - Claims 16-22 drawn to aluminum alloy
can body. Examiner stated "The method
of fabricating recited...could be used
in making can bodies having a different
composition than that claimed in Group II.
For example the metal might contain 4% iron."
Examiner rejected elected Claims 1-15 on
prior art, including Massingill.

Response amends Claims 1-4 and 11 to
specify forming hollow articles and
in other claims to add thickness figures.
Argues over prior art including Massingill

Claims 1-15 allowed and
issue as claims in
Patent No. 3,691,972
Issued Sept. 19, 1972

**Filed March 15, 1972**
S.N. 234,780
Pat. No. 3,814,590
Issued June 4, 1974

Disclosure

Same as S.N. 660,132; 712,314; and 889,790

Claims

Claims presented similar to non-elected claims
16-22 in S.N. 889,790.
Claims to D&I can body made from work-hardened
aluminous metal (0.75-2.5% Fe with Mg and/or Mn)
(Cl. 1-6)
Claims to aluminum base alloy (0.75-2.5% Fe) + Mg
or Mn (Cl. 7-14)

Amendment substitutes Claims 15-37 which
include claims directed to D&I can body
made without annealing or stress relieving
from aluminum alloy with up to 2.5% Fe and
Mg and/or Mn and to method of making same.

Also, terminal disclaimer filed.

Claims allowed and issue
in Patent No. 3,814,590
Issued June 4, 1974

PATENTS IN SUIT, CIVIL
ACTION NO. S-74-172,
U.S. DISTRICT COURT,
SOUTH BEND, INDIANA,
COMPLAINT FILED AUGUST
8, 1974
AMENDED COMPLAINT
FILED JULY 16, 1975